Bruce L. Simon (Bar No. 96241)
**PEARSON, SIMON, WARSHAW & PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
Email: bsimon@pswplaw.com

Michael D. Hausfeld (*pro hac vice* pending)
James J. Pizzirusso (*pro hac vice* pending)
**HAUSFELD LLP**
1700 K Street, NW Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfledllp.com
Email: jpizzirusso@hausfeldllp.com

Neville L. Johnson (Bar No. 66329)
**JOHNSON & JOHNSON LLP**
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095
Email: njohnson@jjllplaw.com

Raymond P. Boucher (Bar No. 115364)
Paul R. Kiesel (Bar No. 119854)
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812
Email: boucher@kbla.com
Email: kiesel@kbla.com
Attorneys for Plaintiffs and the Class

[Additional Counsel Appear on Signature Pages]

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**EDL**

C 12 0559

| | |
|---|---|
| DEBRA SLEDGE, JOAN SLEDGE, KATHY SLEDGE LIGHTFOOT, KIM SLEDGE ALLEN, jointly d/b/a "SISTER SLEDGE," and RONEE BLAKLEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WARNER MUSIC GROUP CORP.,<br><br>Defendant. | CASE NO.<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Debra Sledge, Joan Sledge, Kathy Sledge Lightfoot, Kim Sledge Allen, jointly d/b/a "Sister Sledge," and Ronee Blakley (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through their attorneys, as follows:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this nationwide class action for breach of contract and statutory violations of California and New York law against defendant Warner Music Group Corp., a Delaware corporation with its headquarters in the State of New York that undertakes significant business activity in this District, and its divisions, related and affiliated entities, owned and distributed record labels, and predecessors in interest, including but not limited to the Atlantic Records Group, Independent Label Group, Rhino Entertainment, Warner Bros. Records Group, and Warner Music Nashville (collectively "WARNER"), for WARNER's failure to properly account to Plaintiffs and Class members for royalties stemming from the licensing of Plaintiffs' and Class members' musical performances or recordings produced by them that were sold by "Music Download Providers" and "Ringtone Providers" (collectively "Digital Content Providers") through digital download and distribution. As explained by WARNER itself, "[a]t its core, the recorded music business relies on the exploitation of artistic talent." WARNER 2010 Annual Report at 15 ("Annual Report").[1] In exchange for WARNER's "exploitation" of their talent, Plaintiffs and Class members, as recording artists, are to "receive royalties based on sales and other forms of exploitation of the artists' recorded works." Annual Report at 8.

2. Plaintiffs seek monetary damages, injunctive, and/or declaratory relief against WARNER for its willful violation of contracts between itself and recording artists and/or music producers through which WARNER obtained recording artists' and producers' master recordings

[1] http://investors.wmg.com/phoenix.zhtml?c=182480&p=irol-reportsannual.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

in exchange for the payment of certain royalties to these artists and producers (hereinafter "Standard Recording Agreements"). WARNER has unilaterally breached these contracts by deciding to pay its recording artists and producers a fraction of the actual amount owed to them for the licensing of master recordings to Digital Content Providers.

3. On information and belief, WARNER has entered into licensing agreements with Digital Content Providers whereby these Digital Content Providers are permitted to sell WARNER's catalogue of master recordings (including those made and/or produced by Plaintiffs and Class members under WARNER's Standard Recording Agreements) to end users via digital distribution. In its Form 10K for fiscal year ending September 30, 2011,[2] WARNER states: "We currently partner with a broad range of online and mobile providers, such as iTunes, Napster, MOG, Rdio, Rhapsody, MTV, Nokia, Spotify, Sprint, T-Mobile, Verizon Wireless, Orange, Vodafone, eMusic, Virgin Mobile, China Mobile, YouTube and MySpace Music, and are actively seeking to develop and grow our digital business.

4. On information and belief, under its licensing agreements with Music Download Providers, WARNER receives approximately seventy percent (70%) for every licensed, digital download sold by the Music Download Provider to an end user.

5. On information and belief, under its licensing agreements with Ringtone Providers, WARNER receives approximately fifty percent (50%) of the retail sale price for every licensed, digital download sold by the Ringtone Provider to an end user.

6. Under the Standard Recording Agreements at issue in this case, when WARNER licenses master recordings produced under these agreements to third parties, WARNER is required to pay its recording artists and producers a certain royalty equal to a percentage of all net receipts received by WARNER from these third party-licensees (hereinafter the "Masters Licensed Provisions"). The Masters Licensed Provisions apply to master recordings licensed by WARNER

[2] http://www.sec.gov/Archives/edgar/data/1319161/000119312511334332/d234479d10k.htm.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

to Digital Content Providers for their sale through digital distribution.

7. Rather than paying its recording artists and producers the percentage of net receipts it received—and continues to receive—from Digital Content Providers for "licenses," WARNER wrongfully treats each digital download as a "sale" of a physical phonorecord (i.e., an LP, EP, CD, or cassette tape) through "Normal Retail Channels," which are governed by much lower royalty provisions than "licenses" in WARNER's Standard Recording Agreements. In doing so, WARNER has:

a. Failed to properly account to and pay Plaintiffs and other Class members moneys owed to them from the licensing of master recordings to Digital Content Providers;

b. Underreported the actual number of digital downloads that occur by treating downloads as sales of physical product that might be returned;

c. Deducted, without authorization or legal authority, container/packaging deductions when no such deductions are applicable to digital downloads; and/or

d. Reduced its royalty payments by improperly taking "audiophile deductions."[3]

8. In addition, on information and belief, WARNER illegally withholds a certain percentage of royalties owed to Plaintiffs and Class members as "reserves." These reserves are meant to offset losses related to the return of unsold records; however, digital downloads are incapable of being returned, as there is no physical product to return.

9. During the applicable Class Period, WARNER has, in a wide-spread and calculated manner, violated the royalty provisions of its Standard Recording Agreements with Plaintiffs and Class members by (a) failing to make proper royalty payments to Plaintiffs and Class members and/or (b) failing to properly credit Plaintiffs and Class members' royalty accounts. As a result of WARNER's ongoing breach of the Masters Licensed Provisions, Plaintiffs and Class members

---

[3] Audiophile records are those marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical characteristics.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

have suffered hundreds of millions of dollars in damages.

10. In *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), the Ninth Circuit held, in an analogous action against a defendant not a party to this case, that royalties for digital downloads and mastertones (ringtones) should be paid pursuant to the amounts agreed to for a "license" and not at the lower rate of a "sale." 621 F.3d at 964-67. The Ninth Circuit's ruling became final when the U.S. Supreme Court recently declined review. *See id.*, *cert. denied*, 131 S. Ct. 1677 (March 21, 2011). The conclusion that WARNER has acted improperly in this case follows from the Ninth Circuit's ruling in *F.B.T. Prods.* that Universal Music Group, Inc. ("UMG") and one of its owned and distributed record labels, Aftermath Records, failed as a matter of law to properly account for and pay royalty payments to its royalty participants.

11. In holding that UMG's agreements with "iTunes [the market leader in the digital downloads of recorded music], cellular phone carriers [primarily Sprint, Verizon, and AT&T] and other third parties to use [UMG's] sound recordings to produce and sell permanent downloads and [ring]tones . . . ***qualify as licenses***," id. at 964 (emphasis added), the Ninth Circuit found that the agreements at issue unambiguously provided for a much higher royalty payment than UMG had previously paid.

12. WARNER's Standard Recording Agreements are, in every material way, the same as UMG's Standard Recording Agreements in *F.B.T. Prods.* Accordingly, Plaintiffs here allege that the digital download income received by WARNER from Digital Content Providers are based on "licenses" and not "sales," as those terms are defined in WARNER's Standard Recording Agreements with these Providers. Just as UMG in *F.B.T. Prods.*, WARNER has not properly accounted for the appropriate amount of royalties owed to Plaintiffs and Class members. By this lawsuit, Plaintiffs seeks to compel WARNER to account for and pay all of its recording artists and music producers their rightful share of the licensing income paid to WARNER for digital downloads.

13. Contrary to public perception, not all recording artists are paid vast sums in royalties; in fact, some recording artists have been reported to be destitute after the high points of their careers have passed. *See* Chuck Phillips, "Artists Put Pressure on for Benefits", L.A. TIMES,

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

June 3, 2002. In response to such stories, the California Senate Judiciary Committee co-chaired hearings during which Senator Martha Excutia, Chair of the Committee, noted that "if public tax dollars are being spent to support artists who were cheated out of their royalty earnings, we need to shift the burden back to where it belongs: to the record labels that failed to pay the artists their rightful earnings." Record Label Accounting Practices: J. Hearings of the Cal. State Senate Comm. on the Judiciary and State Senate Select Comm. on the Entm't Indus., 2001-2002 Leg. 3, (Cal. 2002), at 1 (as quoted in 20 Berkeley Tech L. J. 933, 944 n.66).

14. This action seeks the payment to artists of their "rightful earnings."

15. Plaintiffs seek damages on behalf of themselves and all others similarly situated, as well as an accounting and judgment declaring the proper method of calculating payments of royalties or crediting royalty accounts with respect to the licensing of master recordings to Digital Content Providers. Further, Plaintiffs request that this Court order WARNER to adhere to the proper methodology for calculating such royalties in the future.

## II. THE PARTIES

### A. Plaintiffs

16. Plaintiff Debra Sledge is a musician, recording artist, and performing artist who resides in Tempe, Arizona.

17. Plaintiff Joan Sledge is a musician, recording artist, and performing artist who resides in Scottsdale, Arizona.

18. Plaintiff Kathy Sledge Lightfoot is a musician, recording artist, and performing artist who resides in Newtown, Pennsylvania.

19. Plaintiff Kim Sledge Allen is a musician, recording artist, and performing artist who resides in Richboro, Pennsylvania.

20. Together, Plaintiffs Debra Sledge, Joan Sledge, Kathy Sledge Lightfoot, and Kim Sledge Allen formed the musical group "Sister Sledge." They released their first album, *Circle of*

*Love*, in 1975. Their most successful album, *We Are Family*, was released in 1979 and certified Platinum by the Recording Industry Association of America ("RIAA").[4] Their singles "We Are Family" and "He's the Greatest Dancer" from the *We Are Family* album are widely considered two of the most popular songs of all time, both hitting #1 on the U.S. R&B Singles Chart,[5] and #2 and #9 respectively on the American Billboard Hot 100.[6]

21. Plaintiff Ronee Blakley is a singer-songwriter, composer, recording artist, and actress who resides in Los Angeles, California. She has recorded multiple albums and starred in numerous films and television series. She is perhaps best known for her role in Robert Altman's 1975 film *Nashville*, for which Ms. Blakley was nominated for a Best Supporting Actress Oscar. In addition to acting in *Nashville*, Ms. Blakley wrote many of the songs performed in the film. Throughout her career in music, film, television, and on and off Broadway, Ms. Blakley has worked with many luminaries, including Bob Dylan, Sam Shepard, Robert Altman, James Coburn, and Omar Sharif.

22. Defendant Warner Music Group Corp. is a Delaware corporation with its headquarters located in the State of New York. WARNER does extensive business in the State of California, where its recorded music business offices are located. At all relevant times, WARNER was and continues to be in the business of exploiting the sound recordings of musical performances and the audio-visual recordings of such performances. WARNER's exploitation includes, but is not limited to, producing, manufacturing, distributing, licensing, and selling these recordings. WARNER holds and exploits one of the largest music catalogs in the world. WARNER's catalog includes some of the best selling artists of the 20th century, including Black Sabbath, Johnny Cash, Ray Charles, Chicago, John Coltrane, Alice Cooper, The Doors, The

---

4 An RIAA-certified Platinum record is one that has sold at least one million units.

5 http://www.allmusic.com/artist/sister-sledge-p5442/charts-awards/billboard-singles.

6 http://www.billboard.com/charts/hot-100#/artist/sister-sledge/chart-history/5682?f=379&g=Singles.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Eagles, Fleetwood Mac, Aretha Franklin, Green Day, Led Zeppelin, Madonna, Curtis Mayfield, Jodi Mitchell, The Monkees, The Ramones, The Red Hot Chili Peppers, Linda Ronstadt, Rush, Carly Simon, Paul Simon, Frank Sinatra, Lynyrd Skynyrd, and Yes, among many others. Pursuant to its 2010 Annual Report, WARNER is "the world's third-largest recorded music company," with revenues of $2.984 billion during fiscal year 2010, of which $2.455 billion was from its Recorded Music Business. Annual Report at 1.

23. WARNER has at least five major divisions/labels:

a. Atlantic Records Group;

b. Independent Label Group;

c. Rhino Entertainment;

d. Warner Bros. Record Group; and

e. Warner Music Nashville.

24. These major divisions are further subdivided into at least 34 smaller divisions/labels.

25. Warner Music International, a leading company in national and international repertoire, operates through numerous international affiliates and licensees in more than 50 countries. Warner Music Group also includes Warner/Chappell Music, one of the world's leading music publishers, with a catalog of more than one million copyrights worldwide.

## III. JURISDICTION AND VENUE

26. This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, and there is diversity of citizenship between proposed Class members and WARNER. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).

## IV. SUBSTANTIVE ALLEGATIONS

### A. Music Download Services

28. "Music Download Services" allow consumers to purchase and download digital versions of master recordings directly to their computers or other electronic storage devices

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

("Music Downloads"). There is no physical packaging and returns are not permitted. However, Music Downloads often have various restrictions in place to prevent the consumer from copying and/or sharing the Music Download with others. Oftentimes, these restrictions are enforced through a Digital Rights Management system ("DRM") that encrypts the content. Music Download Services are offered by Music Download Providers.

29. On information and belief, in order to allow users to purchase digital copies of the master recordings owned by record labels, Music Download Providers have signed ***licensing*** agreements with WARNER and other record labels. Depending on the licensing agreement with the record label, Music Download Providers generally either: (a) charge a flat, per-download fee to end users; or (b) operate as a subscription service, allowing consumers to access digital copies of the master recordings for a set monthly fee for as long as they continue paying the monthly subscription charge. Some providers offer both options.

30. The first commercially-successful Music Download Provider, Ritmoteca.com, was founded in or around 1999. Ritmoteca signed licensing agreements with WARNER, Sony Music Entertainment, Bertelsmann Music Group, and UMG between 1999 and 2000. These licensing agreements allowed Ritmoteca to offer its customers 300,000 tracks for download at prices between 99¢ and $1.99 per track, or $9.99 per album. Ritmoteca folded during the dot-com bust in April 2000.

31. Shortly thereafter, in or around 2001, other Music Download Services were developed by both the major record labels and by independent companies. WARNER's attempt at a Music Download Service, "MusicNet," was largely unsuccessful due to its high prices, tight restrictions, and competition with illegal downloading sites such as Napster.com.

32. When Apple launched its iTunes Store in April 2003, and offered "legal" Music Downloads for, on average, 99¢ per track or $9.99 per album, the popularity of digital downloads began to grow exponentially. On February 24, 2010, total Music Downloads from the iTunes Store reached 10 billion tracks. Today, the iTunes Store accounts for roughly two-thirds of all Music Downloads. The iTunes store generated $1.4 billion in revenue for Apple in the second quarter of 2011, up from $1.1 billion in the second quarter of 2010.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

33. Besides the iTunes Store, many Music Download Providers have signed licensing deals with WARNER and other record labels to offer Music Downloads to consumers. These providers include, but are not limited to, Amazon.com, Buy.com, Liquid Digital Media (walmart.com), Napster, Rhapsody, Microsoft's Zune Marketplace, and eMusic. In fact, the International Federation of the Phonographic Industry ("IFPI"), a worldwide representative of the record industry, estimates that record labels had licensed roughly 13 million tracks of music to over 400 Music Download Providers by 2010.

34. The licensing of master recordings to Music Download Providers has become highly lucrative for record labels such as WARNER. It is estimated that the licensing of master recordings generated $4.6 billion in worldwide revenue for record labels in 2010, or roughly 29% of their total revenue. In the United States, Music Downloads account for roughly half of record labels' revenues; revenue from Music Downloads is expected to surpass revenue from album sales by 2012. In its most recent Form 10-K, WARNER reported that digital revenues increased by $55 million, or 8%, for the twelve months ended September 30, 2011, driven by the growth in digital downloads in the U.S. and internationally.

35. WARNER itself has recognized the importance of digital sales and the higher profits such sales generate:

> The digital sales channel—both online and mobile—has become an increasingly important sales channel. Online sales include sales of traditional physical formats through both the online distribution arms of traditional retailers such as fye.com and walmart.com and traditional online physical retailers such as Amazon.com, bestbuy.com and barnesandnoble.com. In addition, there has been a proliferation of legitimate online sites, which sell digital music on a per-album or per-track basis or offer subscription and streaming services. Several carriers also offer their subscribers the ability to download music on mobile devices. We currently partner with a broad range of online and mobile providers, such as iTunes, Napster, MOG, Rdio, Rhapsody, MTV, Nokia, Spotify, Sprint, T-Mobile, Verizon Wireless, Orange, Vodafone, eMusic, Virgin Mobile, China Mobile, YouTube and MySpace Music, and are actively seeking to develop and grow our digital business. ***In digital formats, per-unit costs related directly to physical products such as manufacturing, distribution, inventory and return costs do not apply. While there are some digital-specific variable costs and infrastructure investments needed to produce, market and sell digital products, it is reasonable to expect that we will generally derive a higher contribution margin from digital sales than physical sales.***

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Annual Report at 10 (emphasis added).

. . .

> In the digital space, certain costs associated with physical products, such as manufacturing, distribution, inventory and return costs, do not apply. Partially eroding that benefit are increases in mechanical copyright royalties payable to music publishers which apply in the digital space. While there are some digital-specific variable costs and infrastructure investments necessary to produce, market and sell music in digital formats, we believe it is reasonable to expect that digital margins will generally be higher than physical margins as a result of the elimination of certain costs associated with physical products.

*Id.* at 49.

36. Accordingly, WARNER "believe[s] existing and new digital businesses will be a significant source of growth for the next several years and will provide new opportunities to monetize our assets and create new revenue streams." Annual Report at 46. "As an owner of musical content, we believe we are well positioned to take advantage of growth in digital distribution and emerging technologies to maximize the value of our assets." *Id.* Under the heading "Expanding Business Models to Offset Declines in Physical Sales," WARNER notes that "[a] key part of our strategy to offset declines in physical sales is to expand digital sales. New digital models have enabled us to find additional ways to generate revenues from our music content. . . . [S]ales of online and mobile downloads have constituted the majority of our digital Recorded Music and Music Publishing revenue." *Id.* at 49.

37. WARNER continues:

> We derive an increasing portion of our revenues from sales of music through digital distribution channels. We are currently dependent on a small number of leading online music stores that sell consumers digital music. Currently, the largest U.S. online music store, iTunes, charges U.S. consumers prices ranging from $0.69 to $1.29 per single-track download. We have limited ability to increase our wholesale prices to digital service providers for digital downloads as we believe Apple's iTunes controls more than two-thirds of the legitimate digital music track download business in the U.S.

Annual Report at 26.

. . .

> Driving digital revenue remains a top priority and is one of the most significant elements of our long-term growth strategy. The key is to develop well-crafted business models that cater to consumer demands while also fairly compensating content owners.

*Id.* at 3.

38. Unfortunately, WARNER has utterly failed to "fairly compensate" its artists and has instead chosen to enrich itself as set forth herein.

39. WARNER is part of the "Big 4" group of record labels (UMG, EMI, WARNER, and Sony BMG Music Entertainment). Together, these labels license 80% of the Music Downloads sold by Music Download Providers to end users in the United States. WARNER controls the master recordings to roughly 24% of all digital downloads in the United States.

40. Music Download Providers have obtained licenses from WARNER that authorize them to sell or otherwise distribute, via digital download, either all or some of WARNER's catalog of master recordings, including Plaintiffs' recordings as described herein.

41. On information and belief, under its licensing agreements with Music Download Providers, WARNER does not manufacture or warehouse any physical product or packaging, nor does it ship or sell any product to stores or other distribution points, and consequently faces no risk of breakage or the return of unsold product. Rather, as the Ninth Circuit held with respect to Aftermath Records in *F.B.T. Prods.*, WARNER is licensing its catalog of recordings to Music Download Providers for sale or distribution by them via digital download by consumers. WARNER notes in its most recent Form 10K that "[i]n digital formats, per-unit costs related directly to physical products such as manufacturing, distribution, inventory and return costs do not apply" and "it is reasonable to expect that we will generally derive a higher contribution margin from digital sales than physical sales."

42. The prevalence of digital download sales by Music Download Providers means that WARNER's continued improper accounting of royalties owed to Plaintiffs and Class members has deprived Plaintiffs and the Class of millions of dollars in royalties.

**B. Master Ringtones**

43. Ringtones that are a portion/clip of an artist's actual sound recording (rather than an

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

electronic reproduction, e.g., MIDI) and are played on a mobile phone when someone is calling, texting, or otherwise trying to contact the mobile phone operator are known as "mastertones."

44. Mastertones are sold to consumers by Ringtone Providers and range in price between $1.00 and $3.00 per ringtone. Ringtone Providers include, but are not limited to, wireless carriers (e.g., AT&T Wireless, Verizon Wireless, Sprint, and T-Mobile), content owners (e.g., MTV and VH1), and third-party aggregators (e.g., Zed, Hudson Soft, Jamster and iTunes). In general, consumers purchase and download mastertones directly from their mobile phones.

45. On information and belief, in order to sell Mastertones to consumers, Ringtone Providers have entered into license agreements with WARNER and other record labels that authorize Ringtone Providers to use the label's master recordings to produce ringtones for sale to consumers. In return, the Ringtone Providers pay the record labels approximately fifty percent (50%) of the retail sales price of the mastertone.

46. Record labels have made hundreds of millions, if not billions, of dollars from their licensing agreements with Ringtone Providers. Global mastertone sales reached roughly $4 billion in 2004. In the United States, mastertone sales reached $714 million in 2007 and $541 million in 2008.

47. Ringtone Providers continue to sell mastertones and to enter into license agreements with record labels. In fact, Apple did not enter into a license agreement with record labels that enabled them to sell mastertones until in or around September 2009. Currently, mastertones are available on the iTunes Store for between 0.99¢ and $1.29 per download.

48. Mastertones continue to play an important role in record labels' revenue streams as well. The RIAA has added its Gold and Platinum recognition program to mastertone sales. In 2006, the RIAA awarded Gold Status (500,000 downloads) to 84 mastertones, Platinum Status (1,000,000 downloads) to 40 mastertones, and Multi-Platinum Status (increments of 1,000,000 downloads over 1,000,000 downloads) to 4 mastertones. In 2009, the RIAA certified Lil Wayne's "Lollipop" mastertone as 5x Platinum (5 million downloads). In 2010, the RIAA awarded Platinum Status to five additional mastertones: AC/DC's "Thunderstruck"; Akon's "Right Now (Na Na Na)"; Jason Aldean's "Big Green Tractor"; Drake's "Best I Ever Had"; and Young

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Money's "Bedrock."

49. On information and belief, under its licensing agreements with Ringtone Providers, WARNER does not manufacture or warehouse any physical product or packaging, nor does it ship or sell any product to stores or other distribution points, and consequently faces no risk of breakage or the return of unsold product. Rather, WARNER is licensing its catalog of master recordings to Ringtone Providers for sale or distribution by them via digital download to consumers.

50. The lucrative sales of mastertones by Ringtone Providers means that WARNER's continued improper accounting of royalties owed to Plaintiffs and Class members has deprived Plaintiffs and the Class of millions of dollars in royalties.

51. The agreements between Digital Content Providers and WARNER that allow these providers to distribute WARNER's master recordings for sale through digital downloads are "licenses" and subject to the royalty provisions for such clauses.

**C. WARNER's Standard Recording Agreements**

52. WARNER and its predecessors in interest have entered into Standard Recording Agreements with musical artists and producers whose musical performances WARNER intended to commercially exploit. Under these Standard Recording Agreements, the artists and producers promised to make certain master recordings for WARNER and to transfer title to these master recordings so that WARNER could engage in commercial exploitation of these recordings. In return, WARNER promised to pay the recording artists and producers certain royalties.

53. Specifically, under WARNER's Standard Recording Agreements, the artists and producers are entitled to the payment of royalties as either (a) actual payments, or (b) credits against advances paid by WARNER to the artist and/or producer until such advances are recouped, after which time, WARNER is required to pay royalties to the artist and/or producer.

54. WARNER's Standard Recording Agreements set forth and govern the calculation, distribution, and payment of royalties by WARNER to each Class member. On information and belief, these royalties are computed electronically through various software programs that WARNER controls and maintains. Thus, the ability to calculate the amount owed to Plaintiffs and

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Class members is a matter of simple calculations through adjustment of these software programs.

55. In accordance with industry practice, WARNER's Standard Recording Agreements set forth the same, or substantially the same, two equations for all Class members. The royalties owed to these artists and performers equal the sum of two equations:

a. Royalties for phonorecords ***sold*** by WARNER and its affiliates in the United States and abroad ("sold equation"); and

b. Royalties for master recordings ***licensed*** by WARNER to third parties ("licensed equation").

56. These equations were invariably drafted by WARNER and its predecessors in interest and were non-negotiable terms of its Standard Recording Agreements. While WARNER's recording agreements may have varied slightly in non-material ways, every recording agreement that is part of the Class has these standard equations.

57. WARNER's Standard Recording Agreements provide a significantly higher percentage of royalties under the licensed equation than under the sold equation. In general, the sold equation provides for royalties of between five and thirty percent (5% - 30%) (depending on the popularity of the artist; i.e., the more popular, the higher the royalty rate) while the licensed equation generally provides for royalties of twenty-five to fifty percent (25% - 50%) of net receipts. Under both equations, WARNER takes certain deductions before computing the royalties owed. Again, these deductions are all calculated electronically and are a matter of simple inputs into WARNER's standardized software programs.

58. The sold equation in WARNER's Standard Recording Agreements provides for substantially more deductions than those found in the licensed equation. For example, such deductions typically include:

a. A "Net Sales Deduction";

b. A "Container Charge" deduction, depending on the type of phonorecord sold; and/or

c. An "Audiophile Deduction."

59. As a result, a recording artist or producer is paid a significantly lower percentage of

the total money received by WARNER for its commercial exploitation of the artist's or producer's master recordings under the sold equation than under the licensed equation.

**D. The Recording Agreements at Issue**

**1. <u>Sister Sledge's Contract</u>**

60. On or about August 1, 1974, Debra Sledge, Joan Sledge, Kathy Sledge Lightfoot, and Kim Sledge Allen, together known and performing as "Sister Sledge," entered into an agreement with Atlantic Recording Corporation ("Atlantic Records") that is typical of the form recording agreement signed by members of the Class. At the time, Atlantic Records was operating as a label under WARNER. Thus, on information and belief, WARNER owned the rights to the master recordings referred to in the Sister Sledge Agreement.

61. The Sister Sledge Agreement provides that Sister Sledge would record masters for WARNER and WARNER would exploit those masters through the sale and licensing of them.

62. As set forth below, the royalties to be paid to Sister Sledge differ and are dependent on whether a "sale" or "license" of their works occurs.

63. Paragraph 3 of the Sister Sledge Agreement governs the payment of royalties to Sister Sledge for the "sale" and "licensing" of their master recordings.

64. With regard to royalties for "sales," paragraph 3 states:

> Conditioned upon the ARTIST's [Sister Sledge] full and faithful performance of each and all of the material terms hereof, COMPANY shall, except as otherwise provided, pay the ARTIST the applicable amounts specified in the following Schedule:
>
> Initial Period [January 30, 1975 – January 30, 1976] — Five and One-half (5½%) percent
>
> 1st Option Period [January 30, 1976 – January 30, 1977] — Six (6%) percent
>
> 2nd Option Period [January 30, 1977 – January 30, 1978] — Six and One-half (6½%) percent

65. Clauses 3(a)-(i) provide different royalty computations and deductions for the different types and locations of sales.

66. Clause 3(h) deducts a "container" charge for the sale of phonograph records:

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

> COMPANY, in computing royalties hereunder, shall exclude from the suggested retail price, for container charges, a sum equal to ten (10%) of the suggested retail list price for long-play phonograph records . . . [and varying percentages for various types of records].

67. By comparison, clause 3(j) provides for the royalties owed for "masters licensed" to other parties (the "Masters Licensed Provision"). The Masters Licensed Provision of the Sister Sledge Agreement provides:

> Without limiting any of the other provisions of this Agreement, and in addition to all of COMPANY's rights hereunder, COMPANY shall have the right to license the masters, or any of them, to other parties (i) for phonograph record use on a flat-fee basis (as opposed to the royalty basis referred to in Paragraph 3 hereof) and (ii) for all other types of use (visual and nonvisual) on a flat-fee or royalty basis. COMPANY shall credit ARTIST's royalty account with twenty-five (25%) percent of the net amount received by COMPANY under each such license.

68. Thus, the Masters Licensed Provision, from its plain language, demonstrates that the parties intended this clause to govern the ***licensing*** of master recordings by Atlantic Records (or WARNER) to third parties.

69. Sister Sledge has satisfied their obligations under the Sister Sledge Agreement. However, WARNER has not paid Sister Sledge, nor the members of the Class similarly situated, the correct sums for digital downloads of their music or the mastertones relating to them. Instead of paying the agreed-upon rate of twenty-five percent (25%) of net receipts for a ***licensed*** master recording, WARNER pays Sister Sledge and members of the Class similarly situated a much lower royalty based on a ***sale*** of a physical recording (e.g., a CD) which includes, on information and belief, deductions for container charges and other items that are not at issue in the sale of digital downloads and mastertones since no physical product is being manufactured and shipped for use by end-users.

**2. <u>Ronee Blakley's Contract</u>**

70. On July 10, 1975, Ms. Blakley entered into a recording agreement with Warner Bros. Records Inc. that is typical of the form recording agreement signed by members of the Class.

71. The Blakley Agreement provides that Ms. Blakley would record masters for WARNER and WARNER would exploit those masters through the sale and licensing of them.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

72. The Blakley Agreement governed the payment to Ms. Blakley of both domestic and foreign royalties for the sale and licensing of her recordings. On information and belief, those royalty provisions, as set forth below, were and are typical of those found in WARNER's recording agreements from the 1960s to approximately 2004.

73. As set forth below, the royalties to be paid to Ms. Blakley differ and are dependent on whether a "sale" or "license" of her works occurs.

74. Paragraph 5(B)(1) of the Blakely Agreement sets out the royalty to be paid to Ms. Blakley when one of her records is sold. That paragraph reads in pertinent part:

> As to disc records sold in the United States and tape records manufactured and sold in the United States by Warner, a royalty of 9% with respect to the masters for the initial period, 10% with respect to the masters for the first option period and 11% with respect to the masters for the second option period.

75. Royalties on sales, however, are payable after deductions for certain costs associated with the sale of a physical product as set out in pertinent part in Paragraph (b) of Exhibit "A" to the Blakley Agreement:

> Warner's net sales of any record shall be determined cumulatively on the basis of the number of copies of such record sold by Warner or one of its affiliates to an independent third party and for which Warner has been paid, after all returns, rebates, credits, cancellations, exchanges, etc. and prior to final determination thereof Warner may set up reasonable reserves against such returns, etc. of records hereunder which Warner will liquidate annually.

76. Royalties are further reduced so as to account for the cost of the physical packaging of such sales, as set out in pertinent part in Paragraph (i) of Exhibit "A" to the Blakley Agreement:

> A package deduction shall always be applied in arriving at a price on which royalties are computed hereunder, irrespective of wherever and by whatever method of distribution the sales of such records occur.

77. In contrast, according to the Blakely Agreement, when one of Blakley's songs is licensed by WARNER to a third party (e.g., iTunes) and/or sold directly to a consumer (e.g., digital download or mastertones), she is to receive fifty percent (50%) of the money paid to WARNER. Paragraph 5(B)(4) of the Blakley Agreement reads in pertinent part:

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

> As to (i) tape records manufactured and sold in the United States by licensees of Warner, and (ii) disc records and tape records manufactured and sold outside the United States and not covered in 5.B. 2. or 3. above, a royalty equal to fifty percent (50%) of Warner's net receipts for the licensing of masters hereunder, exclusive of any sums due the Phonograph Manufacturers Special Payment Fund, the Music Performance Trust Fund and any similar fund now or hereafter created by reason of a collective bargaining agreement, computed on the same basis as Warner is paid.

78. Further, Paragraph (f) of Exhibit "A" to the Blakley Agreement reads in pertinent part:

> As to records sold directly to consumers or through record clubs, mail order operations or similar sales plans, the royalty rate shall be one-half of the rate otherwise applicable hereunder or one-half of the net royalty rate received by Warner from its licensee where applicable, whichever is greater where licensed, based upon the price to the club members or consumers and computed on the basis of 85% (or on such other basis as the applicable independent record club, operation or plan utilizes in computing its payments to Warner) of the records thus sold and paid for; . . .

79. Finally, Paragraph 5(a) of Exhibit "B" to the Blakley Agreement reads in pertinent part:

> The words "phonograph record," "record," or their equivalent, mean and include any disc record of any material and revolving at any speed, or any magnetic tape or wire, or any other device or contrivance of any type, character or description, now known or unknown, by which sound may be recorded for later transmission to listeners (whether in the immediate presence of a reproducing instrument or device or via radio, television or any other medium) and designed for the reproduction of sound in the phonograph record field as said field is presently understood or may be hereafter.

80. Ms. Blakley has satisfied her obligations under the Blakley Agreement. However, WARNER has not paid Ms. Blakley, nor the members of the Class similarly situated, the correct sums for digital downloads of their music or the mastertones relating to them. Instead of paying the agreed-upon rate of fifty percent (50%) of net receipts for a ***licensed*** master recording, WARNER pays Ms. Blakley and members of the Class similarly situated a much lower royalty based on a ***sale*** of a physical recording (e.g., a CD) which includes, on information and belief, deductions for container charges and other items that are not at issue in the sale of digital downloads and mastertones since no physical product is being manufactured and shipped for use by end-users.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**E. WARNER Has Licensed its Master Recordings to Digital Download Services and Should Pay License Royalty Rates to Artists**

81. WARNER's Standard Recording Agreements provide that where WARNER licenses master recordings to third parties for the third party's record or other use, WARNER will pay the recording artist or producer whose master was licensed fifty percent (50%) of its net receipts from the third party.

82. On information and belief, WARNER has entered into contracts with Digital Content Providers that allow these providers to digitally distribute all or some of WARNER's catalog of master recordings end-users. In exchange, these providers pay WARNER a flat rate or fixed percentage per digital download (typically 70¢). WARNER typically receives "sales accounting reports from digital service providers on a monthly basis, detailing the sales activity, with payments rendered on a monthly or quarterly basis." Form 10-K.

83. These Digital Content Providers include, but are not limited to, the following entities:

a. Apple (iTunes Store);

b. Amazon.com;

c. Buy.com;

d. Liquid Digital Media (walmart.com);

e. Napster;

f. MOG;

g. Rdio;

h. Rhapsody;

i. Microsoft (Zune Marketplace);

j. eMusic;

k. Verizon Wireless;

l. AT&T Wireless;

m. Nokia

n. Sprint;

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

o. T-Mobile;

p. Virgin Mobile;

q. Vodafone;

r. Spotify;

s. MTV;

t. VH1;

u. Zed;

v. Orange;

w. YouTube;

x. MySpace Music

y. Hudson Soft; and

z. Jamster.

84. As discussed herein, WARNER's agreements with these Digital Content Providers constitute licenses and not sales. As such, under WARNER's Standard Recording Agreements, WARNER is required to pay Plaintiffs and Class members the corresponding percentage of its net receipts from these Digital Content Providers for licenses.

85. However, in breach of its contractual obligations under its Standard Recording Agreements, WARNER has treated its transactions with Digital Content Providers as "sales" rather than "licenses." In so doing, WARNER has applied the incorrect formula for calculating royalties owed to Plaintiffs and Class members, taken unjustifiable deductions (including, but not limited to, the Net Sales Deduction, the Container Charge deduction, and the Audiophile Deduction), and applied a royalty percentage that is, in general, less than half of what it should be applying in its computation.

86. Plaintiffs are informed and believe that, before violating its obligations to its royalty participants, WARNER vetted the policies and practices at issue in this case at its highest corporate levels; that it commissioned, either on its own initiative or with the support of the U.S. music industry's principal trade organization, so-called "white papers" on the issue; that it analyzed internally the financial consequences of its misconduct and cast it in terms of the

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

additional profit to be made by it avoiding its contractual obligations; and that it repeatedly made public statements characterizing its agreements with Digital Music Providers in the interest of its recording artists.

87. The Master License Provisions in WARNER's Standard Recording Agreements provide a higher royalty rate than retail sales because in cases where the record label "licenses" the master recordings, the label is essentially acting as a conduit between the artist and a third party, and the label incurs none of the normal costs of goods sold, such as physical materials, distribution, advertising, and promotion. As mentioned above, WARNER recognizes the absence of such costs: "In digital formats, per-unit costs related directly to physical products such as manufacturing, distribution, inventory and return costs do not apply." Annual Report at 10. Because the label incurs none of the traditional costs associated with physical distribution of records when it gives Digital Content Providers the right to sell digital copies of master recordings, these agreements fall within the types of situations contemplated by the parties when they agreed to the Master License Provision.

88. Similarly, the royalty base price in WARNER's Standard Recording Agreement is generally computed, in part, by deducting a "Container Charge." However, Container Charges are meant to compensate the record label for the physical packaging of a record, and as such, are inappropriate for digital downloads that neither have, nor require, physical packaging. Consequently, the royalty base price is unascertainable for digital downloads and cannot apply.

89. The ordinary meaning of a license is the "permission to act," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1304 (2002), while a sale is (a) an actual transfer of title in a copy of the work or (b) the passing of all exclusive, intellectual property rights in a work. *See* 17 U.S.C. § 109 (describing (a)); *Quality King Distribs. v. L'anza Research Int'l*, 523 U.S. 135, 145 (1998) (describing (b)).

90. Based on the ordinary meanings of "license" and "sale," the Ninth Circuit found in *F.B.T. Prods.* that the record labels "did not 'sell' anything to the download distributors. The download distributors did not obtain title to the digital files. The ownership of those files remained with [the label, which] reserved the right to regain possession of the files at anytime, and



PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

[the label] obtained recurring benefits in the form of payments based on the volume of downloads." The facts in this case are analogous, and as such, the ordinary meaning of these words supports a finding that these agreements were "licenses" under the Master License Provision and not "sales."

91. Under the first sale doctrine, after the first sale of a legally copyrighted work, the copyright holder no longer has a right to restrict or prevent subsequent sale of their work. Thus, purchasers are free to resell CDs and other physical music products that were lawfully purchased without obtaining the copyright holder's approval. The U.S. Copyright Office, however, has declined to extend this doctrine to digital media further arguing against these types of transactions as "sales" as opposed to "licenses."

92. Former Apple CEO, Steve Jobs, published a piece entitled "Thoughts on Music" on February 6, 2007 in which he stated, "[s]ince Apple does not own or control any music itself, it must ***license*** the rights to distribute music from others, primarily the 'big four' music companies: Universal, Sony BMG, Warner, and EMI." (Emphasis added). Thus, the CEO of the largest Digital Download Provider in the world has characterized its agreement with WARNER as a "license" and not a "sale."

93. In its terms of service of the iTunes Store, Apple states that "Apple and its ***licensors*** reserve the right to change, suspend, remove, or disable access to any iTunes products, content, or other materials." (Emphasis added.) Thus, Apple has explicitly acknowledged that it licenses content from third parties, which includes WARNER.

94. Upon information and belief, the Master License Provisions found in the recording agreements at issue here, as relevant to the claims herein, are the same or substantially similar to those found in other production and recording agreements across all or substantially all of WARNER's owned and distributed record labels entered into by WARNER and/or its predecessors in interest. Those agreements call for accountings and payments to recording artists and producers for licensing of masters as a percentage (usually fifty percent (50%)) of the net receipts of the label, rather than a lesser percentage as a royalty paid to the artist or producer based on the suggested retail list price of each unit sold.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**F. WARNER's Failure to Provide a Proper Calculation of its Royalty Obligations Has Caused Substantial Damages to Plaintiffs and the Classes**

95. WARNER's accounting practices, as alleged herein, have allowed WARNER to illegally withhold a substantial amount of money it receives from Digital Content Providers at the expense of Plaintiffs and the Classes.

96. As a result, WARNER is paying Plaintiffs and Class Members much lower royalties than it should be paying them for moneys received from Music Download Providers and Ringtone Providers.

97. As a result of WARNER's systematic violation of its contractual obligations to Plaintiffs and other Class members to make proper royalty payments and to properly credit royalty accounts pursuant to its Standard Recording Agreement, WARNER has caused substantial damages to Plaintiffs and Class members, the exact amount to be determined at trial.

98. At all relevant times, WARNER has had a duty and obligation under its recording agreements with Plaintiffs and other Class Members to properly and accurately account for moneys received by WARNER from Digital Content Providers, to which WARNER has licensed the master recordings of Plaintiffs and other Class Members. However, rather than fulfilling its contractual obligations, WARNER has systematically, knowingly, and intentionally miscalculated the royalties due to Plaintiffs and other Class members. As a result, WARNER has under credited and/or underpaid each and every Class member, while also deriving substantial financial benefits from its licensing of these master recordings.

## V. CLASS ACTION ALLEGATIONS

99. Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of themselves and the following Class:

> All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who are or were parties to WARNER recording agreements containing "Master License Provisions" or their equivalent, through which such persons and entities, either directly or indirectly, received royalties on, or financial credits or adjustments for, income received by WARNER for the commercial exploitation of master recordings through

WARNER's licensing of said master recordings to Digital Content Providers, at a rate less than the rate provided for in their contract with WARNER.

100. The following persons and entities shall be excluded from the Class: (1) WARNER and its subsidiaries, affiliates, officers, and employees; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediately family members thereof.

101. Plaintiffs reserve the right to redefine the Class prior to certification.

102. This action is properly maintainable as a class action.

103. The Class for whose benefit this action is brought are so numerous that joinder of all Class members is impracticable. While Plaintiffs do not presently know the exact number of Class members, Plaintiffs are informed and believe that there are tens of thousands of Class members, and that those Class members can only be determined and identified through WARNER's files and, if necessary, other appropriate discovery.

104. There are questions of law and fact which are common to Class members and which predominate over any questions affecting only individual members of the Class. A class action will generate common answers to the below questions, which are apt to drive the resolution of the litigation:

a. Whether WARNER violated its recording agreements by, *inter alia*, mischaracterizing the money it received from Digital Content Providers as "sales" income rather than "license" income in violation of the recording agreements;

b. Whether WARNER benefited financially from its wrongful acts;

c. Whether WARNER acted in a manner calculated to conceal the illegality of its actions from recording artists and music producers;

d. Whether WARNER will continue collecting licensing income from Digital Content Providers and misrepresent the royalties due for such licensing income to its recording artists and music producers despite knowing that such misrepresentation constitutes a breach of its artists' recording contract;

e. Whether WARNER, by way of the conduct alleged herein, must comply

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

with California Code of Civil Procedure §§ 337, 337a and provide a proper accounting of the amounts owed to Plaintiffs and other Class members;

f. Whether WARNER, by way of the conduct alleged herein, engaged in deceptive or unfair acts or practices in violation of California unfair trade practices laws, including but not limited to California Business & Professions Code §§ 17200, *et seq.,* for which Plaintiffs and other Class members are entitled to recover;

g. Whether WARNER, by way of the conduct alleged herein, engaged in deceptive acts or practices in violation of New York's unfair trade practices law, including but not limited to New York General Business Law §§ 349, *et seq*., for which Plaintiffs and other Class members are entitled to recover;

h. Whether, assuming WARNER intends to continue breaching its contractual obligations to Plaintiffs and other Class members, and/or to violate California and/or New York state statutory law, declaratory and injunctive relief is appropriate to curtail its conduct as alleged herein;

i. Whether Plaintiffs and other Class members have been damaged by WARNER's actions or conduct; and

j. The proper measure of damages.

105. Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the claims of other Class members and Plaintiffs have the same interests as other Class members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class. Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

106. The prosecution of separate actions by individual Class members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for WARNER or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class not parties to the adjudications.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

107. Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually. If a Class or general public action is not permitted, Class members will continue to suffer losses and WARNER's misconduct will continue without proper remedy.

108. WARNER has acted and refused to act on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

109. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. Class members may be identified from WARNER's records and such Class members may be notified of the pendency of this action by mail or by electronic means (like email), using techniques and a form of notice customarily used in class actions.

110. For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Breach of Contract)**

**(On Behalf of Plaintiffs and All Class Members)**

111. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

112. Plaintiffs and Class members entered into a Standard Recording Agreement with WARNER or one of its affiliates.

113. These Standard Recording Agreements contained the same or substantially similar terms relating to the treatment of licensing income for royalty accounting. By definition, such licensing income includes income derived from the licensing of recordings to Digital Content Providers.

114. Plaintiffs and other Class members have performed their obligations under their respective recording agreements by providing master recordings to WARNER to exploit. At no

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

point did WARNER advise Plaintiffs and Class members that such master recordings were non-conforming or otherwise objectionable. As a result, all conditions required for WARNER's performance under the written contracts—namely, the payment of the appropriate royalties to Plaintiffs and Class members—have occurred

115. By reason of the foregoing, and other acts not presently known to Plaintiffs and Class members, WARNER has materially breached its contractual obligations under its pertinent Standard Recording Agreements between itself and Class members by failing to properly account and provide adequately royalty compensation to Plaintiffs and Class members with regard to licensing of master recordings to Digital Content Providers. Further, WARNER has disregarded the rights of Plaintiffs and other Class members by breaching its contractual obligations.

116. WARNER has failed and refused to cure these breaches and continues to incorrectly calculate these royalties in violation of Plaintiffs' and Class members' recording agreements. Further, WARNER has continued to disregard the rights of Plaintiffs and other Class members.

117. By reason of the foregoing, Plaintiffs and other Class members have been damaged in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**(Declaratory Judgment)**

**(On Behalf of Plaintiffs and All Class Members)**

118. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

119. Pursuant to its Standard Recording Agreements, WARNER is obligated to pay and/or credit Plaintiffs and other Class members a certain percentage of the income WARNER derives from its licensing of master recordings, produced for WARNER by Plaintiffs and other Class members, to Digital Content Providers, but that WARNER has failed to provide sufficient payment/credit to Plaintiff and other Class members by illegally mischaracterizing these licenses as sales.

120. Plaintiffs and other Class members have no adequate remedy at law.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

121. By reason of the foregoing, there is a present controversy between Plaintiffs and other Class members, on the one hand, and WARNER, on the other hand, with respect to which this Court should enter a declaratory judgment determining that the pertinent recording agreements obligate WARNER to pay and/or credit Plaintiffs and other Class members the percentage specified for licensing, rather than for sales, when WARNER licenses the master recordings of Plaintiffs and other Class members to Digital Content Providers.

**THIRD CAUSE OF ACTION**

**(Common Counts – Open Book Account:**

**California Code of Civil Procedure § 337a)**

**(On Behalf of Plaintiffs and All Class Members)**

122. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

123. Pursuant to WARNER's agreements with Plaintiffs and other Class members, WARNER keeps, and at all relevant times has kept, open book accounts reflecting the debits and credits made to each Class member's account with WARNER from inception. Plaintiffs are informed and believe that said open book accounts include entries reflecting income WARNER has received, and continues to receive, from its license agreements with Digital Content Providers.

124. These book accounts constitute the principal records of the transactions between WARNER and all Class members, including Plaintiffs.

125. Plaintiffs are informed and believe that said book accounts are, and at all relevant times were, created in the regular course of WARNER's business and kept in a reasonably permanent form and manner.

126. WARNER has become indebted to Plaintiffs and other Class members on said open book accounts in an amount equal to WARNER's underpayment on the income WARNER has received, and continues to receive, from its licenses for digital downloads.

127. As such, the outstanding balance owed by WARNER to Plaintiffs and other Class members on said open book accounts, including a calculation of the amount of underpayment with respect to digital downloads, can be determined by examining all of the debits and credits recorded

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

for each account.

**FOURTH CAUSE OF ACTION**

**(Violations of California's Unfair Competition Law:**

**California Business & Professions Code §§ 17200, *et seq.*)**

**(On Behalf of Plaintiffs and All Class Members)**

128. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

129. California Business and Professions Code §§ 17200, *et seq.* prohibits any unlawful, unfair, or fraudulent business acts or practices.

130. As detailed in this Complaint, WARNER has violated the foregoing law, by engaging in unlawful, unfair, and fraudulent business practices. WARNER knowingly breached its Standard Recording Agreements with Plaintiffs and other Class members. WARNER either knew, should have known, or recklessly disregarded that the income it collected from Digital Content Providers was in connection with a license agreement, and as such, that the royalties payable to Plaintiffs and other Class members should have been accounted and paid for on this basis. Furthermore, failing to disclose the unlawful nature of its conduct, and employing such devices as are alleged above, as well as affirmatively representing its authority to collect and account for this income on such basis, had a tendency to mislead Plaintiffs and other Class members.

131. WARNER engaged in "unfair" business acts or practices by converting monies properly due Plaintiffs and the Class under the express terms of the Standard Recording Agreements. WARNER's misconduct offends public policy and is immoral, unscrupulous, unethical, and offensive, and causes substantial injury to consumers.

132. The harm to Plaintiffs and other Class members resulting from WARNER's deceptive and unlawful practices outweighs the utility, if any, of those practices. There is no possible economic justification for such conduct, and consequently, the gravity of the misconduct outweighs any possible economic justification offered by WARNER.

133. WARNER's illegal conduct, as described herein, is ongoing, continues to this date,

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

and constitutes unfair and fraudulent business acts and practices within the meaning of Business & Professions Code §§ 17200, *et seq.*, as interpreted by the California State Courts. Further, WARNER's unlawful and unfair business acts and practices present a continuing threat to Plaintiffs, Class members, and the general public in that WARNER has refused to publicly acknowledge and correct its wrongdoing, and provide compensation for the damages it has caused.

134. Pursuant to California Business & Professions Code § 17203, Plaintiffs and other Class members are therefore entitled to:

a. An Order requiring WARNER to cease the acts of unfair competition alleged herein;

b. An Order enjoining WARNER from continuing to account for royalties payable to Plaintiffs and Class members in the manner it does for income derived from such licenses;

c. Full restitution of all monies paid to and retained by WARNER otherwise payable to Plaintiffs and Class members, including but not limited to, disgorgement pursuant to California Code of Civil Procedure § 384;

d. Interest at the highest rate allowable by law; and

e. The payment of Plaintiffs' attorneys' fees and costs under, among other provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

## FIFTH CAUSE OF ACTION

**(Violations of New York's Unfair Competition Law:**

**New York General Business Law § 349)**

135. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

136. WARNER's acts and practices alleged herein constitute acts, uses, or employment by WARNER and its agents of deceptive practices, fraud, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale of merchandise, and with the subsequent performance, in violation of § 349 of New York's General Business Law,

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

making deceptive and unfair acts and practices illegal.

137. An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful acts or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(a).

138. In breach of its recording contracts, as alleged herein, WARNER has failed to properly account to Plaintiffs and other Class members the actual amount of royalties due from WARNER's licensing contracts with Digital Content Providers. The royalties actually paid to Plaintiffs and others similarly situated are a small fraction of the amounts actually owed by WARNER.

139. WARNER's unfair and deceptive trade acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the Class members, and, unless enjoined, will cause further irreparable injury.

140. As a direct and proximate result of these violations of Section 349 of the General Business Law, Plaintiffs and members of the Class have suffered compensable harm and are entitled to preliminary and permanent injunctive relief, and to recover actual damages, in an amount to be determined at trial, and costs and attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and the other putative Class members, pray for judgment against WARNER as follows:

1. An order certifying the proposed Class, designating Plaintiffs as the named representatives of the Class, and designating the undersigned as Class Counsel;

2. A declaration that WARNER is financially responsible for notifying all Class members that the pertinent recording agreements obligate WARNER to pay and/or credit Plaintiffs and other Class members the percentage specified in their contracts for licensing, rather than for sales, and that WARNER has been improperly accounting for such transactions;

3. An injunction requiring WARNER to abide by the express terms of its Standard Recording Agreements with regard to licensing of master recordings to Digital Content Providers;

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

4. An award to Plaintiffs and the Class of compensatory, exemplary, and/or statutory damages in an amount to be proven at trial;

5. An award of attorneys' fees and costs, as allowed by law;

6. An award of pre-judgment and post-judgment interest, as provided by law;

7. For leave to amend the Complaint to conform to the evidence produced at trial; and

8. Such other and further relief as the Court may deem just and proper.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

**JURY TRIAL DEMANDED**

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

DATED: February 2, 2012                     Respectfully Submitted,

Daniel L. Warshaw

Clifford H. Pearson (Bar No. 108523)
Daniel L. Warshaw (Bar No. 185365)
**PEARSON, SIMON, WARSHAW &
PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788 8300
Facsimile: (818) 788 8104
cpearson@pswplaw.com
dwarshaw@pswplaw.com

Bruce L. Simon (Bar No. 96241)
Aaron M. Sheanin (Bar No. 214472)
William J. Newsom (Bar No. 267643)
**PEARSON, SIMON, WARSHAW &
PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswplaw.com
asheanin@pswplaw.com
wnewsom@pswplaw.com

Michael D. Hausfeld (*pro hac vice* pending)
James J. Pizzirusso (*pro hac vice* pending)
**HAUSFELD LLP**
1700 K Street, NW Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfledllp.com
jpizzirusso@hausfeldllp.com

Michael P. Lehmann (Bar No. 77152)
Bruce J. Wecker (Bar No. 78530)
Arthur N. Bailey, Jr. (Bar No. 248460)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeldllp.com
bwecker@hausfeldllp.com

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

abailey@hausfeldllp.com

Raymond P. Boucher (Bar No. 115364)
Paul R. Kiesel (Bar No. 119854)
Jeffrey A. Koncius (Bar No. 189803)
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812
kiesel@kbla.com
boucher@kbla.com
koncius@kbla.com

Neville L. Johnson (Bar No. 66329)
Douglas L. Johnson (Bar No. 209216)
James T. Ryan (Bar No. 210515)
**JOHNSON & JOHNSON LLP**
439 N. Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095
njohnson@jjllplaw.com
djohnson@jjllplaw.com
jryan@jjllplaw.com

Attorneys for Plaintiffs and the Class

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104