1  Bruce L. Simon (Bar No. 96241)
   **PEARSON, SIMON, WARSHAW & PENNY, LLP**
2  44 Montgomery Street, Suite 2450
   San Francisco, California 94104
3  Telephone: (415) 433-9000
   Facsimile:  (415) 433-9008
4  Email: bsimon@pswplaw.com

5  [Additional counsel appear on signature pages]

6

7                **UNITED STATES DISTRICT COURT**

8            **NORTHERN DISTRICT OF CALIFORNIA**

9

10  DEBRA SLEDGE, JOAN SLEDGE, KATHY        Case No. 12-00559-RS
    SLEDGE LIGHTFOOT, and KIM SLEDGE
11  ALLEN, jointly d/b/a "SISTER SLEDGE";    **CONSOLIDATED AMENDED**
    RONEE BLAKLEY; and GARY WRIGHT,          **COMPLAINT**
12  on behalf of themselves and all others
    similarly situated,                      **CLASS ACTION**
13
              Plaintiffs,                     **JURY TRIAL DEMANDED**
14
        vs.
15
    WARNER MUSIC GROUP CORP.,
16
              Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

844943.1

*PEARSON, SIMON, WARSHAW & PENNY, LLP*
*44 MONTGOMERY STREET, SUITE 2450*
*SAN FRANCISCO, CALIFORNIA 94104*

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    Plaintiffs Debra Sledge, Joan Sledge, Kathy Sledge Lightfoot, and Kim Sledge Allen,

2   jointly d/b/a "Sister Sledge"; Ronee Blakley; and Gary Wright (collectively "Plaintiffs"), on

3   behalf of themselves and all others similarly situated, allege upon personal knowledge as to

4   themselves and their own acts, and upon information and belief as to all other matters, based upon,

5   *inter alia*, the investigation made by and through their attorneys, as follows:

6                                    **I.  NATURE OF THE ACTION**

7    1.    Plaintiffs bring this nationwide class action for breach of contract, breach of the

8   implied covenant of good faith and fair dealing, and statutory violations of California and New

9   York law against defendant Warner Music Group Corp., a Delaware corporation with its

10  headquarters in the State of New York that undertakes significant business activity in this District,

11  and its divisions, related and affiliated entities, owned and distributed record labels, and

12  predecessors in interest, including but not limited to the Atlantic Records Group, Independent

13  Label Group, Rhino Entertainment, Warner Bros. Records Group, and Warner Music Nashville

14  (collectively "WARNER"), for WARNER's failure to properly account to Plaintiffs and Class

15  members for royalties stemming from the licensing of Plaintiffs' and Class members' musical

16  performances or recordings produced by them that were sold by "Music Download Providers" and

17  "Ringtone Providers" (collectively "Digital Content Providers") through digital download and

18  distribution.

19  2.    As explained by WARNER itself, "[a]t its core, the recorded music business relies

20  on the exploitation of artistic talent."  WARNER 2010 Annual Report at 15 ("Annual Report").[1]

21  In exchange for WARNER's "exploitation" of their talent, Plaintiffs and Class members, as

22  recording artists and producers, are to "receive royalties based on sales and other forms of

23  exploitation of the artists' recorded works."  Annual Report at 8.

24  3.    Plaintiffs seek monetary damages, injunctive, and/or declaratory relief against

25  WARNER for its willful violation of contracts between itself and recording artists and/or music

26  _____

27  [1]http://investors.wmg.com/phoenix.zhtml?c=182480&p=irol-reportsannual.

28

844943.1

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  producers through which WARNER obtained recording artists' and producers' master recordings

2  in exchange for the payment of certain royalties to these artists and producers (hereinafter

3  "Production and Recording Agreements").  WARNER has unilaterally breached these contracts by

4  deciding to pay its recording artists and producers a fraction of the actual amount owed to them for

5  the licensing of master recordings to Digital Content Providers.

6          4.      On information and belief, WARNER has entered into licensing agreements with

7  Digital Content Providers whereby these Digital Content Providers are permitted to sell

8  WARNER's catalogue of master recordings (including those made and/or produced by Plaintiffs

9  and Class members under WARNER's Production and Recording Agreements) to end users via

10  digital distribution.  In its Form 10K for fiscal year ending September 30, 2011,[2] WARNER states:

11  "We currently partner with a broad range of online and mobile providers, such as iTunes, Napster,

12  MOG, Rdio, Rhapsody, MTV, Nokia, Spotify, Sprint, T-Mobile, Verizon Wireless, Orange,

13  Vodafone, eMusic, Virgin Mobile, China Mobile, YouTube and MySpace Music, and are actively

14  seeking to develop and grow our digital business."

15          5.      On information and belief, under its licensing agreements with Music Download

16  Providers, WARNER receives approximately seventy percent (70%) for every licensed, digital

17  download sold by the Music Download Provider to an end user.

18          6.      On information and belief, under its licensing agreements with Ringtone Providers,

19  WARNER receives approximately fifty percent (50%) of the retail sale price for every licensed,

20  digital download sold by the Ringtone Provider to an end user.

21          7.      Under the Production and Recording Agreements at issue in this case, when

22  WARNER licenses master recordings produced under these agreements to third parties,

23  WARNER is required to pay its recording artists and producers a certain royalty equal to a

24  percentage of all net receipts received by WARNER from these third party-licensees (hereinafter

25  the "Masters Licensed Provisions").  The Masters Licensed Provisions apply to master recordings

26  _____

27  [2] http://www.sec.gov/Archives/edgar/data/1319161/000119312511334332/d234479d10k.htm.

28

1    licensed by WARNER to Digital Content Providers for their sale through digital distribution.

2        8.       Rather than paying its recording artists and producers the percentage of net receipts

3    it received—and continues to receive—from Digital Content Providers for "licenses," WARNER

4    wrongfully treats each digital download as a "sale" of a physical phonorecord (i.e., an LP, EP, CD,

5    or cassette tape) through "Normal Retail Channels," which are governed by much lower royalty

6    provisions than "licenses" in WARNER's Production and Recording Agreements.  In doing so,

7    WARNER has:

8            a.       Failed to properly account to and pay Plaintiffs and other Class members

9    moneys owed to them from the licensing of master recordings to Digital Content Providers;

10           b.       Underreported the actual number of digital downloads that occur by treating

11   downloads as sales of physical product that might be returned;

12           c.       Deducted, without authorization or legal authority, container/packaging

13   deductions when no such deductions are applicable to digital downloads; and/or

14           d.       Reduced its royalty payments by improperly taking "audiophile

15   deductions."[3]

16       9.       In addition, on information and belief, WARNER illegally withholds a certain

17   percentage of royalties owed to Plaintiffs and Class members as "reserves."  These reserves are

18   meant to offset losses related to the return of unsold records; however, digital downloads are

19   incapable of being returned, as there is no physical product to return.

20       10.      During the applicable Class Period, WARNER has, in a wide-spread and calculated

21   manner, violated the royalty provisions of its Production and Recording Agreements with

22   Plaintiffs and Class members by (a) failing to make proper royalty payments to Plaintiffs and

23   Class members, and/or (b) failing to properly credit Plaintiffs and Class members' royalty

24   accounts.  As a result of WARNER's ongoing breach of the Masters Licensed Provisions,

25   _____

26   [3] Audiophile records are those marketed in specially priced catalog series by reason of their
27   superior sound quality or other distinctive technical characteristics.

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    Plaintiffs and Class members have suffered hundreds of millions of dollars in damages.

2    　　　　11.　　In *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), *cert.*

3    *denied*, 131 S.Ct. 277 (2012) ("*F.B.T.*"), the Ninth Circuit held, in an analogous action against a

4    defendant not a party to this case, that royalties for digital downloads and mastertones (ringtones)

5    should be paid pursuant to the amounts agreed to for a "license" and not at the lower rate of a

6    "sale."  621 F.3d at 964-67.  The conclusion that WARNER has acted improperly in this case

7    follows from the Ninth Circuit's ruling in *F.B.T.* that Universal Music Group, Inc. ("UMG") and

8    one of its owned and distributed record labels, Aftermath Records, failed as a matter of law to

9    properly account for and pay royalty payments to its royalty participants.

10   　　　　12.　　In holding that UMG's agreements with "iTunes [the market leader in the digital

11   downloads of recorded music], cellular phone carriers [primarily Sprint, Verizon, and AT&T] and

12   other third parties to use [UMG's] sound recordings to produce and sell permanent downloads and

13   [ring]tones . . . ***qualify as licenses***," *id*. at 964 (emphasis added), the Ninth Circuit found that the

14   agreements at issue unambiguously provided for a much higher royalty payment than UMG had

15   previously paid.

16   　　　　13.　　WARNER's Production and Recording Agreements are, in every material way, the

17   same as UMG's Production and Recording Agreements in *F.B.T.*  Accordingly, Plaintiffs here

18   allege that the digital download income received by WARNER from Digital Content Providers are

19   based on "licenses" and not "sales," as those terms are defined in WARNER's Production and

20   Recording Agreements with these Providers.  Just as UMG in *F.B.T.*, WARNER has not properly

21   accounted for the appropriate amount of royalties owed to Plaintiffs and Class members. By this

22   lawsuit, Plaintiffs seeks to compel WARNER to account for and pay all of its recording artists and

23   music producers their rightful share of the licensing income paid to WARNER for digital

24   downloads.

25   　　　　14.　　Contrary to public perception, not all recording artists are paid vast sums in

26   royalties; in fact, some recording artists have been reported to be destitute after the high points of

27   their careers have passed.  *See* Chuck Phillips, "Artists Put Pressure on for Benefits", L.A. TIMES,

28   June 3, 2002.  In response to such stories, the California Senate Judiciary Committee co-chaired

1    hearings during which Senator Martha Excutia, Chair of the Committee, noted that "if public tax

2    dollars are being spent to support artists who were cheated out of their royalty earnings, we need

3    to shift the burden back to where it belongs: to the record labels that failed to pay the artists their

4    rightful earnings." Record Label Accounting Practices: J. Hearings of the Cal. State Senate

5    Comm. on the Judiciary and State Senate Select Comm. on the Entm't Indus., 2001-2002 Leg. 3,

6    (Cal. 2002), at 1 (as quoted in 20 Berkeley Tech L. J. 933, 944 n.66) ("California Senate Judiciary

7    Hearing").

8        15.    This action seeks the payment to artists of their "rightful earnings."

9        16.    Plaintiffs seek damages on behalf of themselves and all others similarly situated, as

10   well as an accounting and judgment declaring the proper method of calculating payments of

11   royalties or crediting royalty accounts with respect to the licensing of master recordings to Digital

12   Content Providers. Further, Plaintiffs request that this Court order WARNER to adhere to the

13   proper methodology for calculating such royalties in the future.

14                               **II.  THE PARTIES**

15   **A.    Plaintiffs**

16       17.    Plaintiff Debra Sledge is a musician, recording artist, and performing artist who

17   resides in Tempe, Arizona.

18       18.    Plaintiff Joan Sledge is a musician, recording artist, and performing artist who

19   resides in Scottsdale, Arizona.

20       19.    Plaintiff Kathy Sledge Lightfoot is a musician, recording artist, and performing

21   artist who resides in Newtown, Pennsylvania.

22       20.    Plaintiff Kim Sledge Allen is a musician, recording artist, and performing artist

23   who resides in Richboro, Pennsylvania.

24       21.    Together, Plaintiffs Debra Sledge, Joan Sledge, Kathy Sledge Lightfoot, and Kim

25   Sledge Allen formed the musical group "Sister Sledge." They released their first album, *Circle of*

26

27

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

844943.1

6

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    *Love*, in 1975.  Their most successful album, *We Are Family*, was released in 1979 and certified

2    Platinum by the Recording Industry Association of America ("RIAA").[4]  Their singles "We Are

3    Family" and "He's the Greatest Dancer" from the *We Are Family* album are widely considered

4    two of the most popular songs of all time, both hitting #1 on the U.S. R&B Singles Chart,[5] and #2

5    and #9 respectively on the American Billboard Hot 100.[6]

6        22.    Plaintiff Ronee Blakley ("Blakley") is a singer-songwriter, composer, recording

7    artist, and actress who resides in Los Angeles, California.  She has recorded multiple albums and

8    starred in numerous films and television series.  She is perhaps best known for her role in Robert

9    Altman's 1975 film *Nashville*, for which Plaintiff Blakley was nominated for a Best Supporting

10   Actress Oscar.  In addition to acting in *Nashville*, Plaintiff Blakley wrote many of the songs

11   performed in the film.  Throughout her career in music, film, television, and on and off Broadway,

12   Plaintiff Blakley has worked with many luminaries, including Bob Dylan, Sam Shepard, Robert

13   Altman, James Coburn, and Omar Sharif.

14       23.    Plaintiff Gary Wright ("Wright") is a musician, recording artist, and performing

15   artist who resides in Palos Verdes Estates, California.  Beginning in 1974, Plaintiff Wright

16   embarked on a solo career.  In 1976, Plaintiff Wright released his album *Dream Weaver*, which

17   has been certified as Multi-Platinum by the RIAA.  The title track of this album, "Dream Weaver,"

18   was #2 on the Billboard Hot 100 list and was awarded a Gold Disc by the RIAA.[7]  "Dream

19   Weaver" was featured in at least three feature films: *Wayne's World*, *The People vs. Larry Flynt*,

20   and *Toy Story 3*.  The follow-up single on *Dream Weaver*, "Love is Alive," also reached #2 on the

21   Billboard Hot 100 list, in 1976.  Plaintiff Wright continued to make albums throughout the 1970s,

22   1980s, and 1990s.

23   _____

24

25   [4] An RIAA-certified Platinum album is one that has sold at least one million copies.
     [5] http://www.allmusic.com/artist/sister-sledge-p5442/charts-awards/billboard-singles.

26   [6] http://www.billboard.com/charts/hot-100#/artist/sister-sledge/chart-
     history/5682?f=379&g=Singles.

27   [7] An RIAA-certified Gold Disc is a single that has sold at least 500,000 copies.

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1       24.    Defendant Warner Music Group Corp. is a Delaware corporation with its

2   headquarters located in the State of New York.  WARNER does extensive business in the State of

3   California, where its recorded music business offices are located.  At all relevant times, WARNER

4   was and continues to be in the business of exploiting the sound recordings of musical

5   performances and the audio-visual recordings of such performances.  WARNER's exploitation

6   includes, but is not limited to, producing, manufacturing, distributing, licensing, and selling these

7   recordings.  WARNER holds and exploits one of the largest music catalogs in the world.

8   WARNER's catalog includes some of the best-selling artists of the 20th century, including Black

9   Sabbath, Johnny Cash, Ray Charles, Chicago, John Coltrane, Alice Cooper, The Doors, The

10  Eagles, Fleetwood Mac, Aretha Franklin, Green Day, Led Zeppelin, Madonna, Curtis Mayfield,

11  Jodi Mitchell, The Monkees, The Ramones, The Red Hot Chili Peppers, Linda Ronstadt, Rush,

12  Carly Simon, Paul Simon, Frank Sinatra, Lynyrd Skynyrd, and Yes, among many others.

13  Pursuant to its 2010 Annual Report, WARNER is "the world's third-largest recorded music

14  company," with revenues of $2.984 billion during fiscal year 2010, of which $2.455 billion was

15  from its Recorded Music Business.  Annual Report at 1.

16      25.    WARNER has at least five major divisions/labels:

17          a.    Atlantic Records Group;

18          b.    Independent Label Group;

19          c.    Rhino Entertainment;

20          d.    Warner Bros. Record Group; and

21          e.    Warner Music Nashville.

22      26.    These major divisions are further subdivided into at least 34 smaller

23  divisions/labels.

24      27.    Warner Music International, a leading company in national and international

25  repertoire, operates through numerous international affiliates and licensees in more than 50

26  countries.  Warner Music Group also includes Warner/Chappell Music, one of the world's leading

27  music publishers, with a catalog of more than one million copyrights worldwide.

28

1

## III. JURISDICTION AND VENUE

2    28.    This Court has jurisdiction over this matter pursuant to the Class Action Fairness

3 Act, 28 U.S.C. §§ 1332(d), because the aggregate claims of the Class exceed the sum or value of

4 $5,000,000, and there is diversity of citizenship between proposed Class members and WARNER.

5 This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

6    29.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).

7

## IV. SUBSTANTIVE ALLEGATIONS

8 **A.    Music Download Services**

9    30.    "Music Download Services" allow consumers to purchase and download digital

10 versions of master recordings directly to their computers or other electronic storage devices

11 ("Music Downloads").  There is no physical packaging and returns are not permitted.  However,

12 Music Downloads often have various restrictions in place to prevent the consumer from copying

13 and/or sharing the Music Download with others.  Oftentimes, these restrictions are enforced

14 through a Digital Rights Management system ("DRM") that encrypts the content.  Music

15 Download Services are offered by Music Download Providers.

16    31.    On information and belief, in order to allow users to purchase digital copies of the

17 master recordings owned by record labels, Music Download Providers have signed *licensing*

18 agreements with WARNER and other record labels.  Depending on the licensing agreement with

19 the record label, Music Download Providers generally either: (a) charge a flat, per-download fee to

20 end users; or (b) operate as a subscription service, allowing consumers to access digital copies of

21 the master recordings for a set monthly fee for as long as they continue paying the monthly

22 subscription charge.  Some providers offer both options.

23    32.    The first commercially-successful Music Download Provider, Ritmoteca.com, was

24 founded in or around 1999.  Ritmoteca signed licensing agreements with WARNER, Sony Music

25 Entertainment, Bertelsmann Music Group, and UMG between 1999 and 2000.  These licensing

26 agreements allowed Ritmoteca to offer its customers 300,000 tracks for download at prices

27 between 99¢ and $1.99 per track, or $9.99 per album.  Ritmoteca folded during the dot-com bust

28 in April 2000.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

33.     Shortly thereafter, in or around 2001, other Music Download Services were developed by both the major record labels and by independent companies. WARNER's attempt at a Music Download Service, "MusicNet," was largely unsuccessful due to its high prices, tight restrictions, and competition with illegal downloading sites such as Napster.com.

34.     When Apple launched its iTunes Store in April 2003, and offered "legal" Music Downloads for, on average, 99¢ per track or $9.99 per album, the popularity of digital downloads began to grow exponentially.  On February 24, 2010, total Music Downloads from the iTunes Store reached 10 billion tracks.  Today, the iTunes Store accounts for roughly two-thirds of all Music Downloads.  The iTunes store generated $1.4 billion in revenue for Apple in the second quarter of 2011, up from $1.1 billion in the second quarter of 2010.

35.     Besides the iTunes Store, many Music Download Providers have signed licensing deals with WARNER and other record labels to offer Music Downloads to consumers.  These providers include, but are not limited to, Amazon.com, Buy.com, Liquid Digital Media (walmart.com), Napster, Rhapsody, Microsoft's Zune Marketplace, and eMusic.  In fact, the International Federation of the Phonographic Industry ("IFPI"), a worldwide representative of the record industry, estimates that record labels had licensed roughly 13 million tracks of music to over 400 Music Download Providers by 2010.

36.     The licensing of master recordings to Music Download Providers has become highly lucrative for record labels such as WARNER.  It is estimated that the licensing of master recordings generated $4.6 billion in worldwide revenue for record labels in 2010, or roughly 29% of their total revenue.  In the United States, Music Downloads account for roughly half of record labels' revenues; revenue from Music Downloads is expected to surpass revenue from album sales by 2012.  In its most recent Form 10-K, WARNER reported that digital revenues increased by $55 million, or 8%, for the twelve months ended September 30, 2011, driven by the growth in digital downloads in the U.S. and internationally.

37.     WARNER itself has recognized the importance of digital sales and the higher profits such sales generate:

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

The digital sales channel—both online and mobile—has become an increasingly important sales channel.  Online sales include sales of traditional physical formats through both the online distribution arms of traditional retailers such as fye.com and walmart.com and traditional online physical retailers such as Amazon.com, bestbuy.com and barnesandnoble.com.  In addition, there has been a proliferation of legitimate online sites, which sell digital music on a per-album or per-track basis or offer subscription and streaming services.  Several carriers also offer their subscribers the ability to download music on mobile devices.  We currently partner with a broad range of online and mobile providers, such as iTunes, Napster, MOG, Rdio, Rhapsody, MTV, Nokia, Spotify, Sprint, T-Mobile, Verizon Wireless, Orange, Vodafone, eMusic, Virgin Mobile, China Mobile, YouTube and MySpace Music, and are actively seeking to develop and grow our digital business.  ***In digital formats, per-unit costs related directly to physical products such as manufacturing, distribution, inventory and return costs do not apply.  While there are some digital-specific variable costs and infrastructure investments needed to produce, market and sell digital products, it is reasonable to expect that we will generally derive a higher contribution margin from digital sales than physical sales***.

Annual Report at 10 (emphasis added).

…

In the digital space, certain costs associated with physical products, such as manufacturing, distribution, inventory and return costs, do not apply.  Partially eroding that benefit are increases in mechanical copyright royalties payable to music publishers which apply in the digital space.  While there are some digital-specific variable costs and infrastructure investments necessary to produce, market and sell music in digital formats, we believe it is reasonable to expect that digital margins will generally be higher than physical margins as a result of the elimination of certain costs associated with physical products.

*Id.* at 49.

38.     Accordingly, WARNER "believe[s] existing and new digital businesses will be a significant source of growth for the next several years and will provide new opportunities to monetize our assets and create new revenue streams."  Annual Report at 46.  "As an owner of musical content, we believe we are well positioned to take advantage of growth in digital distribution and emerging technologies to maximize the value of our assets."  *Id.*  Under the heading "Expanding Business Models to Offset Declines in Physical Sales," WARNER notes that "[a] key part of our strategy to offset declines in physical sales is to expand digital sales.  New digital models have enabled us to find additional ways to generate revenues from our music

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   content. . . . [S]ales of online and mobile downloads have constituted the majority of our digital

2   Recorded Music and Music Publishing revenue." *Id.* at 49.

3          39.     WARNER further states in its Annual Report:

4                  We derive an increasing portion of our revenues from sales of music
                   through digital distribution channels. We are currently dependent
5                  on a small number of leading online music stores that sell consumers
                   digital music. Currently, the largest U.S. online music store,
6                  iTunes, charges U.S. consumers prices ranging from $0.69 to $1.29
                   per single-track download. We have limited ability to increase our
7                  wholesale prices to digital service providers for digital downloads as
                   we believe Apple's iTunes controls more than two-thirds of the
8                  legitimate digital music track download business in the U.S.

9   Annual Report at 26.

10                 …

11                 Driving digital revenue remains a top priority and is one of the most
                   significant elements of our long-term growth strategy. The key is to
12                 develop well-crafted business models that cater to consumer
                   demands while also fairly compensating content owners.

13

14  *Id.* at 3.

15         40.     Unfortunately, WARNER has utterly failed to "fairly compensate" its artists and

16  has instead chosen to enrich itself as set forth herein.

17         41.     WARNER is part of the "Big 4" group of record labels (UMG, EMI, WARNER,

18  and Sony BMG Music Entertainment). Together, these labels license 80% of the Music

19  Downloads sold by Music Download Providers to end users in the United States. WARNER

20  controls the master recordings to roughly 24% of all digital downloads in the United States.

21         42.     Music Download Providers have obtained licenses from WARNER that authorize

22  them to sell or otherwise distribute, via digital download, either all or some of WARNER's

23  catalog of master recordings, including Plaintiffs' recordings as described herein.

24         43.     On information and belief, under its licensing agreements with Music Download

25  Providers, WARNER does not manufacture or warehouse any physical product or packaging, nor

26  does it ship or sell any product to stores or other distribution points, and consequently faces no

27  risk of breakage or the return of unsold product. Rather, as the Ninth Circuit held with respect to

28  Aftermath Records in *F.B.T.*, WARNER is licensing its catalog of recordings to Music Download

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   Providers for sale or distribution by them via digital download by consumers.  WARNER notes in

2   its most recent Form 10K that "[i]n digital formats, per-unit costs related directly to physical

3   products such as manufacturing, distribution, inventory and return costs do not apply" and "it is

4   reasonable to expect that we will generally derive a higher contribution margin from digital sales

5   than physical sales."

6          44.     The prevalence of digital download sales by Music Download Providers means that

7   WARNER's continued improper accounting of royalties owed to Plaintiffs and Class members has

8   deprived Plaintiffs and the Class of millions of dollars in royalties.

9   **B.     Master Ringtones**

10         45.     Ringtones that are a portion/clip of an artist's actual sound recording (rather than an

11  electronic reproduction, *e.g.*, MIDI) and are played on a mobile phone when someone is calling,

12  texting, or otherwise trying to contact the mobile phone operator are known as "mastertones."

13         46.     Mastertones are sold to consumers by Ringtone Providers and range in price

14  between $1.00 and $3.00 per ringtone.  Ringtone Providers include, but are not limited to, wireless

15  carriers (*e.g.*, AT&T Wireless, Verizon Wireless, Sprint, and T-Mobile), content owners (e.g.,

16  MTV and VH1), and third-party aggregators (*e.g.*, Zed, Hudson Soft, Jamster and iTunes).  In

17  general, consumers purchase and download mastertones directly from their mobile phones.

18         47.     On information and belief, in order to sell Mastertones to consumers, Ringtone

19  Providers have entered into license agreements with WARNER and other record labels that

20  authorize Ringtone Providers to use the label's master recordings to produce ringtones for sale to

21  consumers.  In return, the Ringtone Providers pay the record labels approximately fifty percent

22  (50%) of the retail sales price of the mastertone.

23         48.     Record labels have made hundreds of millions, if not billions, of dollars from their

24  licensing agreements with Ringtone Providers.  Global mastertone sales reached roughly $4 billion

25  in 2004.  In the United States, mastertone sales reached $714 million in 2007 and $541 million in

26  2008.

27         49.     Ringtone Providers continue to sell mastertones and to enter into license

28  agreements with record labels.  In fact, Apple did not enter into a license agreement with record

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    labels that enabled them to sell mastertones until in or around September 2009.  Currently,

2    mastertones are available on the iTunes Store for between 0.99¢ and $1.29 per download.

3         50.     Mastertones continue to play an important role in record labels' revenue streams as

4    well.  The RIAA has added its Gold and Platinum recognition program to mastertone sales.  In

5    2006, the RIAA awarded Gold Status (500,000 downloads) to 84 mastertones, Platinum Status

6    (1,000,000 downloads) to 40 mastertones, and Multi-Platinum Status (increments of 1,000,000

7    downloads over 1,000,000 downloads) to 4 mastertones.  In 2009, the RIAA certified Lil Wayne's

8    "Lollipop" mastertone as 5x Platinum (5 million downloads).  In 2010, the RIAA awarded

9    Platinum Status to five additional mastertones: AC/DC's "Thunderstruck"; Akon's "Right Now

10   (Na Na Na)"; Jason Aldean's "Big Green Tractor"; Drake's "Best I Ever Had"; and Young

11   Money's "Bedrock."

12        51.     On information and belief, under its licensing agreements with Ringtone Providers,

13   WARNER does not manufacture or warehouse any physical product or packaging, nor does it ship

14   or sell any product to stores or other distribution points, and consequently faces no risk of

15   breakage or the return of unsold product.  Rather, WARNER is licensing its catalog of master

16   recordings to Ringtone Providers for sale or distribution by them via digital download to

17   consumers.

18        52.     The lucrative sales of mastertones by Ringtone Providers means that WARNER's

19   continued improper accounting of royalties owed to Plaintiffs and Class members has deprived

20   Plaintiffs and the Class of millions of dollars in royalties.

21        53.     The agreements between Digital Content Providers and WARNER that allow these

22   providers to distribute WARNER's master recordings for sale through digital downloads are

23   "licenses" and subject to the royalty provisions for such clauses.

24   **C.     WARNER's Production and Recording Agreements**

25        54.     WARNER and its predecessors in interest have entered into Production and

26   Recording Agreements with musical artists and producers whose musical performances

27   WARNER intended to commercially exploit.  Under these Production and Recording Agreements,

28   the artists and producers promised to make certain master recordings for WARNER and to transfer

1  title to these master recordings so that WARNER could engage in commercial exploitation of

2  these recordings.  In return, WARNER promised to pay the recording artists and producers certain

3  royalties.

4        55.     Specifically, under WARNER's Production and Recording Agreements, the artists

5  and producers are entitled to the payment of royalties as either (a) actual payments, or (b) credits

6  against advances paid by WARNER to the artist and/or producer until such advances are

7  recouped, after which time, WARNER is required to pay royalties to the artist and/or producer.

8        56.     WARNER's Production and Recording Agreements set forth and govern the

9  calculation, distribution, and payment of royalties by WARNER to each Class member.  On

10  information and belief, these royalties are computed electronically through various software

11  programs that WARNER controls and maintains.  Thus, the ability to calculate the amount owed

12  to Plaintiffs and Class members is a matter of simple calculations through adjustment of these

13  software programs.

14        57.     In accordance with industry practice, WARNER's Production and Recording

15  Agreements set forth substantially the same two equations for all Class members.  The royalties

16  owed to these artists and performers equal the sum of two equations:

17           a.     Royalties for phonorecords **sold** by WARNER and its affiliates in the

18  United States and abroad ("sold equation"); and

19           b.     Royalties for master recordings **licensed** by WARNER to third parties

20  ("licensed equation").

21        58.     These equations were invariably drafted by WARNER and its predecessors in

22  interest and were non-negotiable terms of its Production and Recording Agreements.  While

23  WARNER's recording agreements may have varied slightly in non-material ways, every recording

24  agreement that is part of the Class has these standard equations.

25        59.     WARNER's Production and Recording Agreements provide a significantly higher

26  percentage of royalties under the licensed equation than under the sold equation.  In general, the

27  sold equation provides for royalties of between five and thirty percent (5% - 30%) (depending on

28  the popularity of the artist; i.e., the more popular, the higher the royalty rate) while the licensed

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    equation generally provides for royalties of twenty-five to fifty percent (25% - 50%) of net

2    receipts.  Under both equations, WARNER takes certain deductions before computing the

3    royalties owed.  Again, these deductions are all calculated electronically and are a matter of simple

4    inputs into WARNER's standardized software programs.

5          60.     The sold equation in WARNER's Production and Recording Agreements provides

6    for substantially more deductions than those found in the licensed equation.  For example, such

7    deductions typically include:

8                  a.      A "Net Sales Deduction";

9                  b.      A "Container Charge" deduction, depending on the type of phonorecord

10   sold; and/or

11                 c.      An "Audiophile Deduction."

12         61.     As a result, a recording artist or producer is paid a significantly lower percentage of

13   the total money received by WARNER for its commercial exploitation of the artist's or producer's

14   master recordings under the sold equation than under the licensed equation.

15         62.     It has long been industry practice to withhold "reserves" to ensure the licensee does

16   not distribute royalties it cannot recoup on units of an album that are shipped but later returned.

17   This is another standard practice in WARNER's recording agreements.  This policy is

18   "reasonable" with respect to CDs or LPs, which may be returned if the product is damaged or if

19   the consumer wants to exchange the album for another.  This policy is not reasonable with respect

20   to the license of digital downloads, however, which cannot be returned or otherwise exchanged by

21   consumers, and which do not require that WARNER incur any of the normal costs of production

22   or distribution associated with physical products such as CDs and LPs.  Accordingly, any

23   "reserves" withheld on digital downloads are based on pure fiction and deprive Plaintiffs and the

24   Class of the full benefit of royalties to which they are entitled.

25   **D.      The Recording Agreements at Issue**

26         **1.      Sister Sledge's Contract**

27         63.     On or about August 1, 1974, Debra Sledge, Joan Sledge, Kathy Sledge Lightfoot,

28   and Kim Sledge Allen, together known and performing as "Sister Sledge," entered into an

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  agreement with Atlantic Recording Corporation ("Atlantic Records") that is typical of the form

2  recording agreement signed by members of the Class.  At the time, Atlantic Records was operating

3  as a label under WARNER.  Thus, on information and belief, WARNER owned the rights to the

4  master recordings referred to in the Sister Sledge Agreement.

5       64.    The Sister Sledge Agreement provides that Sister Sledge would record masters for

6  WARNER and WARNER would exploit those masters through the sale and licensing of them.

7       65.    As set forth below, the royalties to be paid to Sister Sledge differ and are dependent

8  on whether a "sale" or "license" of their works occurs.

9       66.    Paragraph 3 of the Sister Sledge Agreement governs the payment of royalties to

10  Sister Sledge for the "sale" and "licensing" of their master recordings.

11      67.    With regard to royalties for "sales," paragraph 3 states:

12          Conditioned upon the ARTIST's [Sister Sledge] full and faithful
            performance of each and all of the material terms hereof,
13          COMPANY shall, except as otherwise provided, pay the ARTIST
            the applicable amounts specified in the following Schedule:

14

15  | Initial Period | Five and One- |
    | [January 30, 1975 – January 30, 1976] | half (5½%) |
    | | percent |

16

17  | 1st Option Period | Six (6%) |
    | [January 30, 1976 – January 30, 1977] | percent |

18  | 2nd Option Period | Six and One- |
    | [January 30, 1977 – January 30, 1978] | half (6½%) |
19  | | percent |

20      68.    Clauses 3(a)-(i) provide different royalty computations and deductions for the

21  different types and locations of sales.

22      69.    Clause 3(h) deducts a "container" charge for the sale of phonograph records:

23          COMPANY, in computing royalties hereunder, shall exclude from
            the suggested retail price, for container charges, a sum equal to ten
24          (10%) of the suggested retail list price for long-play phonograph
            records . . . [and varying percentages for various types of records].

25

26      70.    By comparison, clause 3(j) provides for the royalties owed for "masters licensed"

27  to other parties (the "Masters Licensed Provision").  The Masters Licensed Provision of the Sister

28  Sledge Agreement provides:

844943.1

> Without limiting any of the other provisions of this Agreement, and in addition to all of COMPANY's rights hereunder, COMPANY shall have the right to license the masters, or any of them, to other parties (i) for phonograph record use on a flat-fee basis (as opposed to the royalty basis referred to in Paragraph 3 hereof) and (ii) for all other types of use (visual and nonvisual) on a flat-fee or royalty basis.  COMPANY shall credit ARTIST's royalty account with twenty-five (25%) percent of the net amount received by COMPANY under each such license.

71.     Thus, the Masters Licensed Provision, from its plain language, demonstrates that the parties intended this clause to govern the ***licensing*** of master recordings by Atlantic Records (or WARNER) to third parties.

72.     Sister Sledge has satisfied its obligations under the Sister Sledge Agreement. However, WARNER has not paid Sister Sledge, nor the members of the similarly situated Class, the correct sums for digital downloads of their music or the mastertones relating to them.  Instead of paying the agreed-upon rate of twenty-five percent (25%) of net receipts for a ***licensed*** master recording, WARNER pays Sister Sledge and members of the similarly situated Class a much lower royalty based on a ***sale*** of a physical recording (*e.g.*, a CD) which includes, on information and belief, deductions for container charges and other items that are not at issue in the sale of digital downloads and mastertones since no physical product is being manufactured and shipped for use by end-users.

### 2.     Ronee Blakley's Contract

73.     On July 10, 1975, Plaintiff Blakley entered into a recording agreement with Warner Bros. Records Inc. that is typical of the form recording agreement signed by members of the Class.

74.     The Blakley Agreement provides that Ms. Blakley would record masters for WARNER and WARNER would exploit those masters through the sale and licensing of them.

75.     The Blakley Agreement governed the payment to Ms. Blakley of both domestic and foreign royalties for the sale and licensing of her recordings.  On information and belief, those royalty provisions, as set forth below, were and are typical of those found in WARNER's recording agreements from the 1960s to approximately 2004.

76.     As set forth below, the royalties to be paid to Ms. Blakley differ and are dependent on whether a "sale" or "license" of her works occurs.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

77.     Paragraph 5(B)(1) of the Blakely Agreement sets out the royalty to be paid to Ms. Blakley when one of her records is sold. That paragraph reads in pertinent part:

> As to disc records sold in the United States and tape records manufactured and sold in the United States by Warner, a royalty of 9% with respect to the masters for the initial period, 10% with respect to the masters for the first option period and 11% with respect to the masters for the second option period.

78.     Royalties on sales, however, are payable after deductions for certain costs associated with the sale of a physical product as set out in pertinent part in Paragraph (b) of Exhibit "A" to the Blakley Agreement:

> Warner's net sales of any record shall be determined cumulatively on the basis of the number of copies of such record sold by Warner or one of its affiliates to an independent third party and for which Warner has been paid, after all returns, rebates, credits, cancellations, exchanges, etc. and prior to final determination thereof Warner may set up reasonable reserves against such returns, etc. of records hereunder which Warner will liquidate annually.

79.     Royalties are further reduced so as to account for the cost of the physical packaging of such sales, as set out in pertinent part in Paragraph (i) of Exhibit "A" to the Blakley Agreement:

> A package deduction shall always be applied in arriving at a price on which royalties are computed hereunder, irrespective of wherever and by whatever method of distribution the sales of such records occur.

80.     In contrast, according to the Blakely Agreement, when one of Plaintiff Blakley's songs is licensed by WARNER to a third party (e.g., iTunes) and/or sold directly to a consumer (*e.g*., digital download or mastertones), she is to receive fifty percent (50%) of the money paid to WARNER. Paragraph 5(B)(4) of the Blakley Agreement reads in pertinent part:

> As to (i) tape records manufactured and sold in the United States by licensees of Warner, and (ii) disc records and tape records manufactured and sold outside the United States and not covered in 5.B. 2. or 3. above, a royalty equal to fifty percent (50%) of Warner's net receipts for the licensing of masters hereunder, exclusive of any sums due the Phonograph Manufacturers Special Payment Fund, the Music Performance Trust Fund and any similar fund now or hereafter created by reason of a collective bargaining agreement, computed on the same basis as Warner is paid.

81.     Further, Paragraph (f) of Exhibit "A" to the Blakley Agreement reads in pertinent part:

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

> As to records sold directly to consumers or through record clubs, mail order operations or similar sales plans, the royalty rate shall be one-half of the rate otherwise applicable hereunder or one-half of the net royalty rate received by Warner from its licensee where applicable, whichever is greater where licensed, based upon the price to the club members or consumers and computed on the basis of 85% (or on such other basis as the applicable independent record club, operation or plan utilizes in computing its payments to Warner) of the records thus sold and paid for; . . .

82.     Finally, Paragraph 5(a) of Exhibit "B" to the Blakley Agreement reads in pertinent part:

> The words "phonograph record," "record," or their equivalent, mean and include any disc record of any material and revolving at any speed, or any magnetic tape or wire, or any other device or contrivance of any type, character or description, now known or unknown, by which sound may be recorded for later transmission to listeners (whether in the immediate presence of a reproducing instrument or device or via radio, television or any other medium) and designed for the reproduction of sound in the phonograph record field as said field is presently understood or may be hereafter.

83.     Plaintiff Blakley has satisfied her obligations under the Blakley Agreement. However, WARNER has not paid Plaintiff Blakley, nor the members of the Class similarly situated, the correct sums for digital downloads of their music or the mastertones relating to them. Instead of paying the agreed-upon rate of fifty percent (50%) of net receipts for a ***licensed*** master recording, WARNER pays Plaintiff Blakley and members of the similarly situated Class a much lower royalty based on a ***sale*** of a physical recording (*e.g.*, a CD) which includes, on information and belief, deductions for container charges and other items that are not at issue in the sale of digital downloads and mastertones since no physical product is being manufactured and shipped for use by end-users.

**3.     Gary Wright's Contract**

84.     On or about September 5, 1974, High Wave Music, Inc. f/s/o Gary Wright entered into an agreement with WARNER that is typical of the form recording agreement signed by members of the Class ("Wright Agreement").

85.     The Wright Agreement provides that Plaintiff Wright would record masters for WARNER and WARNER would exploit those masters through the sale and licensing of them.

86.     As set forth below, the royalties to be paid to Plaintiff Wright differ and are

1  dependent on whether a "sale" or "license" of his works occurs.

2        87.    Paragraph 5 of the Wright Agreement governs the payment of royalties to Plaintiff

3  Wright for the "sale" of his master recordings.

4        88.    With regard to royalties for "sales," paragraph 5(b)(1)(a)-(b) states:

> A royalty as follows with regard to phonograph records manufactured and sold embodying the performances of Artist recorded under this agreement:
> (1) As to disc records manufactured and sold in the United States and tape records manufactured and sold by Distributor in the United States:
> (a). As to the masters for the initial period, the first option period and the second option period, a royalty of 11% on the first 200,000 royalty-bearing copies (including disc and tape) sold through normal distribution channels, a royalty of 12% on the next 200,000 such copies sold and a royalty of 13% on all such copies sold in excess of 400,000.
> (b). As to the masters for the third option period and the fourth option period, a royalty of 12% on the first 200,000 royalty bearing copies (including disc and tape) sold through normal distribution channels, a royalty of 13% on the next 200,000 such copies sold and a royalty of 14% on-all such copies sold in excess of 400,000.

89.    Clauses 5(b)(2)-(3) provide different royalty computations and deductions for the different locations of sales.

90.    Clause 5(b)(4) provides for the royalties owed for "masters licensed" to other parties (the "Masters Licensed Provision"):

> As to (i) tape records manufactured and sold in the United States by licensees of Distributor, and (ii) disc records and tape records manufactured and sold outside the United States and not covered in 5.b.(2)-(3) above, a royalty equal to fifty percent (50%) of Distributor's net receipts derived from the masters hereunder, exclusive of any sums due the Phonograph Record Manufacturer's Special Payment Fund, the Music Performance Trust Fund and any similar fund now or hereafter created by reason of a collective bargaining agreement, computed on the same basis as Distributor is paid.

91.    All clauses of 5(b) are "computed and paid in accordance with Exhibit 'A' attached hereto [to the Wright Agreement] in which Distributor is referred to as 'Warner' and Producer is

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

referred to as 'you' which shall modify and govern the above as set forth therein."

92.     Paragraph (b) of "Exhibit 'A' - Computation of Royalties" provides that royalties computed on net sales shall be determined after returns:  "Warner's net sales of any record shall be determined cumulatively on the basis of the number of copies of such record sold by Warner or one of its affiliates to an independent third party and for which Warner has been paid, after all returns, rebates, credits, cancellations, exchanges, etc. and prior to final determination thereof Warner may set up reasonable reserves against such returns, etc. of records hereunder."

93.     Paragraph (f) of "Exhibit 'A' - Computation of Royalties" also reiterates the Masters Licensed Provision and that 50% of net receipts governs:

> As to records sold directly to consumers or through record clubs, mail order operations or similar sales plans, the royalty rate shall be one-half of the rate otherwise applicable hereunder or one-half of the net royalty rate received by Warner from its licensee where applicable, whichever is less,* (*except that where licensed and where one half the net royalties rate received is the greater, said greater shall apply) based upon the price to the club members or consumers and computed on the basis of 85% (or on such other basis as the applicable independent record club, operation or plan utilizes in computing its payments to Warner) of the records thus sold and paid for; no royalties shall be payable with respect to records sold or given as "free", "bonus" or "dividend" records as a result of joining the club, operation or plan and/or purchasing a required number of other records.

94.     Thus, the Masters Licensed Provision, from its plain language, demonstrates that the parties intended this clause to govern the *licensing* of master recordings by WARNER to third parties.

95.     Plaintiff Wright has satisfied his obligation under the Wright Agreement. However, WARNER has not paid Plaintiff Wright, nor the members of the Class similarly situated, the correct sums for digital transmissions of their music.  Instead of paying the agreed-upon rate of fifty (50%) of net receipts for a *licensed* master recording, WARNER pays Plaintiff Wright and members of the similarly situated Class a much lower royalty based on a *sale* of a physical recording (*e.g.*, a CD) which includes, on information and belief, return reserves, deductions for container charges, and other items that are not at issue in digital transmissions since

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  no physical product is being manufactured and shipped for use by end-users.

2      96.    In September 2011, Plaintiff Wright conducted an audit of his royalty statements

3  which found that from July 1, 2004 to June 30, 2011, WARNER underpaid him by at least

4  $121,680.64, not including interest.  Plaintiff Wright shared the results of his audit with

5  WARNER, but WARNER refused to correct its underpayments.

6  **E.    WARNER Has Licensed its Master Recordings to Digital Download Services and**

7      **Should Pay License Royalty Rates to Artists**

8      97.    WARNER's Production and Recording Agreements provide that where WARNER

9  licenses master recordings to third parties for the third party's record or other use, WARNER will

10  pay the recording artist or producer whose master was licensed fifty percent (50%) of its net

11  receipts from the third party.

12      98.    On information and belief, WARNER has entered into contracts with Digital

13  Content Providers that allow these providers to digitally distribute all or some of WARNER's

14  catalog of master recordings end-users.  In exchange, these providers pay WARNER a flat rate or

15  fixed percentage per digital download (typically 70¢).  WARNER typically receives "sales

16  accounting reports from digital service providers on a monthly basis, detailing the sales activity,

17  with payments rendered on a monthly or quarterly basis."  Form 10-K.

18      99.    These Digital Content Providers include, but are not limited to, the following

19  entities:

20          a.    Apple (iTunes Store);

21          b.    Amazon.com;

22          c.    Buy.com;

23          d.    Liquid Digital Media (walmart.com);

24          e.    Napster;

25          f.    MOG;

26          g.    Rdio;

27          h.    Rhapsody;

28          i.    Microsoft (Zune Marketplace);

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

j.      eMusic;

k.      Verizon Wireless;

l.      AT&T Wireless;

m.     Nokia

n.      Sprint;

o.      T-Mobile;

p.      Virgin Mobile;

q.      Vodafone;

r.      Spotify;

s.      MTV;

t.      VH1;

u.      Zed;

v.      Orange;

w.      YouTube;

x.      MySpace Music

y.      Hudson Soft; and

z.      Jamster.

100.    As discussed herein, WARNER's agreements with these Digital Content Providers constitute licenses and not sales.  As such, under WARNER's Production and Recording Agreements, WARNER is required to pay Plaintiffs and Class members the corresponding percentage of its net receipts from these Digital Content Providers for licenses.

101.    However, in breach of its contractual obligations under its Production and Recording Agreements, WARNER has treated its transactions with Digital Content Providers as "sales" rather than "licenses."  In so doing, WARNER has applied the incorrect formula for calculating royalties owed to Plaintiffs and Class members, taken unjustifiable deductions (including, but not limited to, the Net Sales Deduction, the Container Charge deduction, and the Audiophile Deduction), and applied a royalty percentage that is, in general, less than half of what it should be applying in its computation.

1    102.    Plaintiffs are informed and believe that, before violating its obligations to its

2    royalty participants, WARNER vetted the policies and practices at issue in this case at its highest

3    corporate levels; that it commissioned, either on its own initiative or with the support of the U.S.

4    music industry's principal trade organization, so-called "white papers" on the issue; that it

5    analyzed internally the financial consequences of its misconduct and cast it in terms of the

6    additional profit to be made by it avoiding its contractual obligations; and that it repeatedly made

7    public statements characterizing its agreements with Digital Music Providers in the interest of its

8    recording artists.

9    103.    The Master License Provisions in WARNER's Production and Recording

10   Agreements provide a higher royalty rate than retail sales because in cases where the record label

11   "licenses" the master recordings, the label is essentially acting as a conduit between the artist and

12   a third party, and the label incurs none of the normal costs of goods sold, such as physical

13   materials, distribution, advertising, and promotion.  As mentioned above, WARNER recognizes

14   the absence of such costs: "In digital formats, per-unit costs related directly to physical products

15   such as manufacturing, distribution, inventory and return costs do not apply."  Annual Report at

16   10.  Because the label incurs none of the traditional costs associated with physical distribution of

17   records when it gives Digital Content Providers the right to sell digital copies of master

18   recordings, these agreements fall within the types of situations contemplated by the parties when

19   they agreed to the Master License Provision.

20   104.    Similarly, the royalty base price in WARNER's Production and Recording

21   Agreement is generally computed, in part, by deducting a "Container Charge."  However,

22   Container Charges are meant to compensate the record label for the physical packaging of a

23   record, and as such, are inappropriate for digital downloads that neither have, nor require, physical

24   packaging. Consequently, the royalty base price is unascertainable for digital downloads and

25   cannot apply.

26   105.    The ordinary meaning of a license is the "permission to act," WEBSTER'S THIRD

27   NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1304 (2002), while a sale is (a) an

28   actual transfer of title in a copy of the work or (b) the passing of all exclusive, intellectual property

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  rights in a work.  *See* 17 U.S.C. § 109 (describing (a)); *Quality King Distribs. v. L'anza Research*

2  *Int'l*, 523 U.S. 135, 145 (1998) (describing (b)).

3        106.    Based on the ordinary meanings of "license" and "sale," the Ninth Circuit found in

4  *F.B.T. Prods.* that the record labels "did not 'sell' anything to the download distributors.  The

5  download distributors did not obtain title to the digital files.  The ownership of those files

6  remained with [the label, which] reserved the right to regain possession of the files at any time,

7  and [the label] obtained recurring benefits in the form of payments based on the volume of

8  downloads."  The facts in this case are analogous, and as such, the ordinary meaning of these

9  words supports a finding that these agreements were "licenses" under the Master License

10  Provision and not "sales."

11        107.    Under the first sale doctrine, after the first sale of a legally copyrighted work, the

12  copyright holder no longer has a right to restrict or prevent subsequent sale of their work.  Thus,

13  purchasers are free to resell CDs and other physical music products that were lawfully purchased

14  without obtaining the copyright holder's approval.  The U.S. Copyright Office, however, has

15  declined to extend this doctrine to digital media further arguing against these types of transactions

16  as "sales" as opposed to "licenses."

17        108.    Former Apple CEO, Steve Jobs, published a piece entitled "Thoughts on Music" on

18  February 6, 2007 in which he stated, "[s]ince Apple does not own or control any music itself, it

19  must *license* the rights to distribute music from others, primarily the 'big four' music companies:

20  Universal, Sony BMG, Warner, and EMI."  (Emphasis added).  Thus, the CEO of the largest

21  Digital Download Provider in the world has characterized its agreement with WARNER as a

22  "license" and not a "sale."

23        109.    In its terms of service of the iTunes Store, Apple states that "Apple and its

24  *licensors* reserve the right to change, suspend, remove, or disable access to any iTunes products,

25  content, or other materials."  (Emphasis added.)  Thus, Apple has explicitly acknowledged that it

26  licenses content from third parties, which includes WARNER.

27        110.    Upon information and belief, the Master License Provisions found in the recording

28  agreements at issue here, as relevant to the claims herein, are the same or substantially similar to

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  those found in other production and recording agreements across all or substantially all of

2  WARNER's owned and distributed record labels entered into by WARNER and/or its

3  predecessors in interest.  Those agreements call for accountings and payments to recording artists

4  and producers for licensing of masters as a percentage (usually fifty percent (50%)) of the net

5  receipts of the label, rather than a lesser percentage as a royalty paid to the artist or producer based

6  on the suggested retail list price of each unit sold.

7  **F.      WARNER's Failure to Provide a Proper Calculation of its Royalty Obligations Has**

8  **          Caused Substantial Damages to Plaintiffs and the Class**

9       111.    WARNER's accounting practices, as alleged herein, have allowed WARNER to

10  illegally withhold a substantial amount of money it receives from Digital Content Providers at the

11  expense of Plaintiffs and the Class.

12       112.    As a result, WARNER is paying Plaintiffs and Class Members much lower

13  royalties than it should be paying them for moneys received from Music Download Providers and

14  Ringtone Providers.

15       113.    As a result of WARNER's systematic violation of its contractual obligations to

16  Plaintiffs and other Class members to make proper royalty payments and to properly credit royalty

17  accounts pursuant to its Production and Recording Agreement, WARNER has caused substantial

18  damages to Plaintiffs and Class members, the exact amount to be determined at trial.

19       114.    At all relevant times, WARNER has had a duty and obligation under its recording

20  agreements with Plaintiffs and other Class Members to properly and accurately account for

21  moneys received by WARNER from Digital Content Providers, to which WARNER has licensed

22  the master recordings of Plaintiffs and other Class Members.  However, rather than fulfilling its

23  contractual obligations, WARNER has systematically, knowingly, and intentionally miscalculated

24  the royalties due to Plaintiffs and other Class members.  As a result, WARNER has under credited

25  and/or underpaid each and every Class member, while also deriving substantial financial benefits

26  from its licensing of these master recordings.

27                          **V.  CLASS ACTION ALLEGATIONS**

28       115.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a)

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   and 23(b) on behalf of themselves and the following Class:

2       All persons and entities, their agents, successors in interest, assigns,
3   heirs, executors, and administrators who are or were parties to
    WARNER recording agreements containing "Master License
    Provisions" or their equivalent, through which such persons and
4   entities, either directly or indirectly, received royalties on, or
    financial credits or adjustments for, income received by WARNER
5   for the commercial exploitation of master recordings through

6       WARNER's licensing of said master recordings to Digital Content
    Providers, at a rate less than the rate provided for in their contract
7       with WARNER.

8       116.    The following persons and entities shall be excluded from the Class: (1) WARNER

9   and its subsidiaries, affiliates, officers, and employees; (2) all persons who make a timely election

10   to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom

11   this case is assigned and any immediately family members thereof.

12       117.    Plaintiffs reserve the right to redefine the Class prior to certification.

13       118.    This action is properly maintainable as a class action.

14       119.    The Class for whose benefit this action is brought are so numerous that joinder of

15   all Class members is impracticable.  While Plaintiffs do not presently know the exact number of

16   Class members, Plaintiffs are informed and believe that there are tens of thousands of Class

17   members, and that those Class members can only be determined and identified through

18   WARNER's files and, if necessary, other appropriate discovery.

19       120.    There are questions of law and fact which are common to Class members and

20   which predominate over any questions affecting only individual members of the Class.  A class

21   action will generate common answers to the below questions, which are apt to drive the resolution

22   of the litigation:

23       a.    Whether WARNER violated its recording agreements by, *inter alia*,

24   mischaracterizing the money it received from Digital Content Providers as "sales" income rather

25   than "license" income in violation of the recording agreements;

26       b.    Whether WARNER benefited financially from its wrongful acts;

27       c.    Whether WARNER acted in a manner calculated to conceal the illegality of

28   its actions from recording artists and music producers;

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    d.    Whether WARNER will continue collecting licensing income from Digital

2 Content Providers and misrepresent the royalties due for such licensing income to its recording

3 artists and music producers despite knowing that such misrepresentation constitutes a breach of its

4 artists' recording contract;

5    e.    Whether WARNER, by way of the conduct alleged herein, must comply

6 with California Code of Civil Procedure §§ 337, 337a and provide a proper accounting of the

7 amounts owed to Plaintiffs and other Class members;

8    f.    Whether WARNER, by way of the conduct alleged herein, engaged in

9 deceptive or unfair acts or practices in violation of California unfair trade practices laws, including

10 but not limited to California Business & Professions Code §§ 17200, *et seq.,* for which Plaintiffs

11 and other Class members are entitled to recover;

12    g.    Whether WARNER, by way of the conduct alleged herein, engaged in

13 deceptive acts or practices in violation of New York's unfair trade practices law, including but not

14 limited to New York General Business Law §§ 349, *et seq.*, for which Plaintiffs and other Class

15 members are entitled to recover;

16    h.    Whether, assuming WARNER intends to continue breaching its contractual

17 obligations to Plaintiffs and other Class members, and/or to violate California and/or New York

18 state statutory law, declaratory and injunctive relief is appropriate to curtail its conduct as alleged

19 herein;

20    i.    Whether Plaintiffs and other Class members have been damaged by

21 WARNER's actions or conduct; and

22    j.    The proper measure of damages.

23    121.    Plaintiffs are committed to prosecuting this action and have retained competent

24 counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of other

25 Class members and Plaintiffs have the same interests as other Class members.  Plaintiffs have no

26 interests that are antagonistic to, or in conflict with, the interests of the other members of the

27 Class.  Plaintiffs are adequate representatives of the Class and will fairly and adequately protect

28 the interests of the Class.

122.    The prosecution of separate actions by individual Class members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for WARNER or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class not parties to the adjudications.

123.    Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually.  If a Class or general public action is not permitted, Class members will continue to suffer losses and WARNER's misconduct will continue without proper remedy.

124.    WARNER has acted and refused to act on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

125.    Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action.  Class members may be identified from WARNER's records and such Class members may be notified of the pendency of this action by mail or by electronic means (like email), using techniques and a form of notice customarily used in class actions.

126.    For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## VI.  CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Breach of Contract)

127.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

128.    Plaintiffs and Class members entered into a Production or Recording Agreement with WARNER or one of its affiliates.

129.    These Production or Recording Agreements contained substantially similar terms relating to the treatment of licensing income for royalty accounting.  By definition, such licensing

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

income includes income derived from the licensing of recordings to Digital Content Providers.

130.   Plaintiffs and other Class members have performed their obligations under their respective recording agreements by providing master recordings to WARNER to exploit.  At no point did WARNER advise Plaintiffs and Class members that such master recordings were non-conforming or otherwise objectionable.  As a result, all conditions required for WARNER's performance under the written contracts—namely, the payment of the appropriate royalties to Plaintiffs and Class members—have occurred

131.   By reason of the foregoing, and other acts not presently known to Plaintiffs and Class members, WARNER has materially breached its contractual obligations under its pertinent Production and Recording Agreements between itself and Class members by failing to properly account and provide adequately royalty compensation to Plaintiffs and Class members with regard to licensing of master recordings to Digital Content Providers.  Further, WARNER has disregarded the rights of Plaintiffs and other Class members by breaching its contractual obligations.

132.   WARNER has failed and refused to cure these breaches and continues to incorrectly calculate these royalties in violation of Plaintiffs' and Class members' recording agreements.  Further, WARNER has continued to disregard the rights of Plaintiffs and other Class members.

133.   By reason of the foregoing, Plaintiffs and other Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

134.   Plaintiffs repeat and reallege every allegation as though fully set forth herein.

135.   This cause of action applies to those contracts of Plaintiffs and putative Class members containing California choice of law provisions.

136.   This cause of action is brought under California law, which recognizes an independent claim for breach of the implied covenant of good faith and fair dealing inherent in every contract.

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

137.   Plaintiffs have performed their obligations under the respective Recording Agreements with WARNER described above and all conditions required for WARNER's performance under them have occurred.

138.   Under California law, where a contract confers on one party a power affecting the rights of the other, a duty is imposed to exercise such discretion in good faith and in accordance with fair dealing.  By the course of conduct alleged herein, WARNER has not acted in good faith or in accordance with fair dealing by, *inter alia*, improperly treating its transactions with Digital Content Providers who provide permanent downloads to consumers as sales rather than licenses and by failing to properly account and provide adequately royalty compensation to Plaintiffs and Class members with regard to licensing of master recordings to Digital Content Providers. WARNER has therefore unfairly interfered with Plaintiffs' rights to receive benefits under their respective Recording Agreements.

139.   Plaintiffs and Class members have been damaged as a result of WARNER's breach of the implied covenant of good faith and fair dealing by failing to properly account and provide adequately royalty compensation to Plaintiffs and Class members with regard to licensing of master recordings to Digital Content Providers.  These underpayments constitute damages to Plaintiffs and Class members that they otherwise would not have incurred, for which Plaintiffs and Class members seek relief as prayed below.

### THIRD CAUSE OF ACTION

### (Declaratory Judgment)

140.   Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

141.   Pursuant to its Production and Recording Agreements, WARNER is obligated to pay and/or credit Plaintiffs and other Class members a certain percentage of the income WARNER derives from its licensing of master recordings, produced for WARNER by Plaintiffs and other Class members, to Digital Content Providers, but that WARNER has failed to provide sufficient payment/credit to Plaintiff and other Class members by illegally mischaracterizing these licenses as sales.

844943.1

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1    142.    Plaintiffs and other Class members have no adequate remedy at law.

2    143.    By reason of the foregoing, there is a present controversy between Plaintiffs and

3    other Class members, on the one hand, and WARNER, on the other hand, with respect to which

4    this Court should enter a declaratory judgment determining that the pertinent recording agreements

5    obligate WARNER to pay and/or credit Plaintiffs and other Class members the percentage

6    specified for licensing, rather than for sales, when WARNER licenses the master recordings of

7    Plaintiffs and other Class members to Digital Content Providers.

8                        **FOURTH CAUSE OF ACTION**

9                     **(Common Counts – Open Book Account:**

10                 **California Code of Civil Procedure § 337a)**

11   144.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs

12   above as though fully set forth herein.

13   145.    This cause of action applies to those contracts of Plaintiffs and putative Class

14   members containing California choice of law provisions.

15   146.    Pursuant to WARNER's agreements with Plaintiffs and other Class members,

16   WARNER keeps, and at all relevant times has kept, open book accounts reflecting the debits and

17   credits made to each Class member's account with WARNER from inception. Plaintiffs are

18   informed and believe that said open book accounts include entries reflecting income WARNER

19   has received, and continues to receive, from its license agreements with Digital Content Providers.

20   147.    These book accounts constitute the principal records of the transactions between

21   WARNER and all Class members, including Plaintiffs.

22   148.    Plaintiffs are informed and believe that said book accounts are, and at all relevant

23   times were, created in the regular course of WARNER's business and kept in a reasonably

24   permanent form and manner.

25   149.    WARNER has become indebted to Plaintiffs and other Class members on said open

26   book accounts in an amount equal to WARNER's underpayment on the income WARNER has

27   received, and continues to receive, from its licenses for digital downloads.

28   150.    As such, the outstanding balance owed by WARNER to Plaintiffs and other Class

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   members on said open book accounts, including a calculation of the amount of underpayment with

2   respect to digital downloads, can be determined by examining all of the debits and credits recorded

3   for each account.

## FIFTH CAUSE OF ACTION

### (Violations of California's Unfair Competition Law:

### California Business & Professions Code §§ 17200, *et seq.*)

7   151.   Plaintiffs repeat and reallege each and every allegation contained in the paragraphs

8   above as though fully set forth herein.

9   152.   This cause of action applies to those contracts of Plaintiffs and putative class

10  members containing California choice of law provisions.

11  153.   California Business and Professions Code §§ 17200, *et seq.* prohibits any unlawful,

12  unfair, or fraudulent business acts or practices.

13  154.   As detailed in this Complaint, WARNER has violated the foregoing law, by

14  engaging in unlawful, unfair, and fraudulent business practices.  WARNER knowingly breached

15  its Production and Recording Agreements with Plaintiffs and other Class members.  WARNER

16  either knew, should have known, or recklessly disregarded, that the income it collected from

17  Digital Content Providers was in connection with a license agreement, and as such, that the

18  royalties payable to Plaintiffs and other Class members should have been accounted and paid for

19  on this basis.  Furthermore, WARNER's failure to disclose the unlawful nature of its conduct, and

20  employing such devices as are alleged above, as well as affirmatively representing its authority to

21  collect and account for this income on such basis, had a tendency to mislead Plaintiffs and other

22  Class members.  In addition, separately from its breaches of Production and Recording

23  Agreements, WARNER issued royalty statements to Plaintiffs and members of the Class and

24  responded to audit requests by adversely affected artists in a manner that attempted to disguise its

25  wrongdoing.

26  155.   WARNER engaged in "unfair" business acts or practices by converting monies

27  properly due Plaintiffs and the Class under the express terms of the Production and Recording

28  Agreements.  WARNER's misconduct offends public policy and is immoral, unscrupulous,

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1   unethical, and offensive, and causes substantial injury to consumers.

2       156.    The harm to Plaintiffs and other Class members resulting from WARNER's

3   deceptive and unlawful practices outweighs the utility, if any, of those practices.  There is no

4   possible economic justification for such conduct, and consequently, the gravity of the misconduct

5   outweighs any possible economic justification offered by WARNER.

6       157.    WARNER's illegal conduct, as described herein, is ongoing, continues to this date,

7   and constitutes unfair and fraudulent business acts and practices within the meaning of Business &

8   Professions Code §§ 17200, *et seq.*, as interpreted by the California State Courts.  Further,

9   WARNER's unlawful and unfair business acts and practices present a continuing threat to

10  Plaintiffs, Class members, and the general public in that WARNER has refused to publicly

11  acknowledge and correct its wrongdoing, and provide compensation for the damages it has caused.

12      158.    The fair treatment of artists has been a matter of intense public concern. The

13  California Senate Judiciary Hearing mentioned above reflects this concern. So does the testimony

14  of Jeffery Harleston (now a senior executive of UMG) on behalf of the RIAA (of which

15  WARNER is a member), who testified before the United States Senate Judiciary Committee on

16  July 29, 2008 that:

17          For example, at Geffen records we license the use of our
18          recordings to hundreds of companies, from Amazon.com, MTV,
        MySpace and Verizon, to television programs like "Greys
19          Anatomy" to retail outlets like Wal-Mart, to video games, toys,
        toothbrushes and greeting cards. What is important is that the
20          negotiation of the license in each instance takes into account the
        market considerations. For example, a license of a recording for a
21          toothbrush will have a different fee than the license of the same
        recording when it is selected on demand and downloaded to an
22          iPod.

23

24      159.    In fact, since the *F.B. T.* case, there has been extensive news coverage about how

25  artists are shortchanged on digital download royalties by record labels, including WARNER.  For

26

27

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  example, there was a recent lengthy *Hollywood Reporter* piece on how the record labels mistreat

2  artists and engage in all sorts of dubious accounting.[8] The Future of Music Coalition, a national

3  nonprofit organization, also has published a lengthy piece on the class action suits spawned by

4  *F.B.T.*[9] There are segments of the consuming public on iTunes that support artists' rights and feel

5  that artists ought to get full compensation for the download of their works.[10] The Sister Sledge

6  lawsuit has also spawned numerous press articles, attesting to the intense public interest in this

7  controversy.[11]

8         160.    Pursuant to California Business & Professions Code § 17203, Plaintiffs and other

9  Class members are entitled to:

10              a.      An Order requiring WARNER to cease the acts of unfair competition

11  alleged herein;

12              b.      An Order enjoining WARNER from continuing to account for royalties

13  payable to Plaintiffs and Class members in the manner it does for income derived from such

14  licenses;

15              c.      Full restitution of all monies paid to and retained by WARNER otherwise

16  payable to Plaintiffs and Class members, including but not limited to, disgorgement pursuant to

17  California Code of Civil Procedure § 384;

18              d.      Interest at the highest rate allowable by law; and

19              e.      The payment of Plaintiffs' attorneys' fees and costs under, among other

20  provisions of law, Cal. Code Civ. Proc. § 1021.5, or otherwise to the extent permitted by law.

---

22  [8] http://www.hollywoodreporter.com/thr-esq/eminem-royalty-lawsuit-aftermath-records-fbt-productions-293881.

23  [9] http://futureofmusic.org/blog/2012/03/20/just-my-label-running-away-my-royalties.

24  [10] *See, e.g.*, http://www.downhillbattle.org/itunes/.

25  [11]  *See, e.g.*, http://www.hollywoodreporter.com/thr-esq/sister-sledge-files-class-action-286903;
26  http://mediadecoder.blogs.nytimes.com/2012/02/03/digital-notes-sister-sledge-sues-over-royalties-and-a-censoring-glitch-at-itunes/; http://entertainment.slashdot.org/story/12/02/10/043259/sale-or-license-sister-sledge-sues-over-itunes.

28

1

## SIXTH CAUSE OF ACTION

2

### (Violations of New York's Unfair Competition Law:

3

### New York General Business Law § 349)

4          161.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs

5     above as though fully set forth herein.

6          162.    This cause of action applies to those contracts of Plaintiffs and putative Class

7     members containing New York choice of law provisions.

8          163.     WARNER's acts and practices alleged herein constitute acts, uses, or employment

9     by WARNER and its agents of deceptive practices, fraud, false promises, misrepresentations, or

10    the knowing concealment, suppression, or omission of material facts with the intent that others

11    rely upon such concealment, suppression, or omission, in connection with the sale of merchandise,

12    and with the subsequent performance, in violation of § 349 of New York's General Business Law,

13    making deceptive and unfair acts and practices illegal.

14         164.    An individual "injured by reason of any violation of this section may bring an

15    action in his own name to enjoin such unlawful acts or practice, an action to recover his actual

16    damages or fifty dollars, whichever is greater, or both such actions."  N.Y. Gen. Bus. Law §

17    349(a).

18         165.    In breach of its recording contracts, as alleged herein, WARNER has failed to

19    properly account to Plaintiffs and other Class members the actual amount of royalties due from

20    WARNER's licensing contracts with Digital Content Providers.  The royalties actually paid to

21    Plaintiffs and others similarly situated are a small fraction of the amounts actually owed by

22    WARNER.  In addition, separately from its breaches of Production and Recording Agreements,

23    WARNER issued royalty statements to Plaintiffs and members of the Class and responded to audit

24    requests by adversely affected artists in a manner that attempted to disguise its wrongdoing.

25         166.    Such conduct affected the public interest in New York.  Such conduct is not limited

26    to contractual disputes unique to specific counterparties, but involved a company-wide common

27    policy directed to all of WARNER's artists whose music is digitally downloaded through Digital

28    Content Providers like iTunes.  As noted above, this case presents a dispute that has garnered

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

1  extensive public attention and support.[12]

2      167.    The conduct in question also emanated, in part, from WARNER's corporate

3  headquarters in New York and was implemented through written and/or oral communications

4  directed to members of the Class in New York, including Plaintiffs.

5      168.    WARNER's unfair and deceptive trade acts and practices have directly,

6  foreseeably, and proximately caused damages and injury to Plaintiffs and the Class members, and,

7  unless enjoined, will cause further irreparable injury.

8      169.    As a direct and proximate result of these violations of Section 349 of the General

9  Business Law, Plaintiffs and members of the Class have suffered compensable harm and are

10  entitled to preliminary and permanent injunctive relief, and to recover actual damages, in an

11  amount to be determined at trial, and costs and attorney's fees.

12                      **PRAYER FOR RELIEF**

13      **WHEREFORE,** Plaintiffs, on behalf of themselves and the other putative Class members,

14  pray for judgment against WARNER as follows:

15      1.    An order certifying the proposed Class, designating Plaintiffs as the named

16  representatives of the Class, and designating the undersigned as Class Counsel;

17      2.    A declaration that WARNER is financially responsible for notifying all Class

18  members that the pertinent recording agreements obligate WARNER to pay and/or credit Plaintiffs

19  and other Class members the percentage specified in their contracts for licensing, rather than for

20  sales, and that WARNER has been improperly accounting for such transactions;

21      3.    An injunction requiring WARNER to abide by the express terms of its Production

22  and Recording Agreements with regard to licensing of master recordings to Digital Content

23  _____

24  [12] Indeed, the fact that the allegations have a general impact on the public interest is supported to
25  by the fact that in 2004, the New York Attorney General entered into a consent decree with
    WARNER and other record labels that "had failed to maintain contact with many artists and
26  writers and had stopped making required payments to them."
27  http://www.nytimes.com/2004/05/05/arts/record-labels-must-pay-shortchanged-performers.html.

28

1   Providers;

2       4.      An award to Plaintiffs and the Class of compensatory, exemplary, and/or statutory

3   damages in an amount to be proven at trial;

4       5.      An award of attorneys' fees and costs, as allowed by law;

5       6.      An award of pre-judgment and post-judgment interest, as provided by law;

6       7.      For leave to amend the Complaint to conform to the evidence produced at trial; and

7       8.      Such other and further relief as the Court may deem just and proper.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

## JURY TRIAL DEMANDED

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

DATED: August 21, 2012

Respectfully Submitted,

/s/ Daniel L. Warshaw

Daniel L. Warshaw

Clifford H. Pearson (Bar No. 108523)
Daniel L. Warshaw (Bar No. 185365)
**PEARSON, SIMON, WARSHAW &
PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788 8300
Facsimile: (818) 788 8104
cpearson@pswplaw.com
dwarshaw@pswplaw.com

Bruce L. Simon (Bar No. 96241)
Aaron M. Sheanin (Bar No. 214472)
William J. Newsom (Bar No. 267643)
**PEARSON, SIMON, WARSHAW &
PENNY, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswplaw.com
asheanin@pswplaw.com
wnewsom@pswplaw.com

Michael D. Hausfeld (*pro hac vice*)
James J. Pizzirusso (*pro hac vice*)
Nathaniel D. Giddings (*pro hac vice*)
**HAUSFELD LLP**
1700 K Street, NW Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfeldllp.com
jpizzirusso@hausfeldllp.com
ngiddings@hausfeldllp.com

Michael P. Lehmann (Bar No. 77152)
Bruce J. Wecker (Bar No. 78530)
Arthur N. Bailey, Jr. (Bar No. 248460)
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104

Telephone: (415) 633-1908
Facsimile:  (415) 358-4980
mlehmann@hausfeldllp.com
bwecker@hausfeldllp.com
abailey@hausfeldllp.com

Raymond P. Boucher (Bar No. 115364)
Paul R. Kiesel (Bar No. 119854)
Jeffrey A. Koncius (Bar No. 189803)
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90211
Telephone: (310) 854-4444
Facsimile:  (310) 854-0812
kiesel@kbla.com
boucher@kbla.com
koncius@kbla.com

David M. Given (State Bar No. 142375)
Nicholas A. Carlin (State Bar No. 112532)
Alexander H. Tuzin (State Bar No. 267760)
**PHILLIPS, ERLEWINE & GIVEN LLP**
50 California Street, 35th Floor
San Francisco, CA   94111
Tel: 415-398-0900
Fax: 415-398-0911
dmg@phillaw.com
nac@phillaw.com
aht@phillaw.com

Michael W. Sobol (Cal. Bar No. 194857)
**LIEFF CABRASER HEIMANN  & BERNSTEIN,
LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Interim Co-Lead Class Counsel*

PEARSON, SIMON, WARSHAW & PENNY, LLP
44 MONTGOMERY STREET, SUITE 2450
SAN FRANCISCO, CALIFORNIA 94104